720 A.2d 948

**Daniel J. FREEDENBURG**

v.

**Elinor S. FREEDENBURG.**

**No. 1718, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Nov. 30, 1998.

730

Cynthia E. Young, Annapolis, for Appellant.

Patricia E. McDonald and J. Michael Lawlor, Towson, for Appellee.

Submitted before HOLLANDER and SALMON, JJ., and PAUL E. ALPERT, Judge (Retired, Specially Assigned).

SALMON, Judge.

On August 14, 1997, the Circuit Court for Baltimore County granted an absolute divorce that dissolved the marriage of Elinor S. Freedenburg to Dr. Daniel J. Freedenburg. The ground for the divorce was separation for more than two years. The trial judge awarded Ms. Freedenburg alimony in the amount of $5,000 per month for five years plus $10,000 in attorney's fees. He also set forth a formula for calculating a

marital award but did not specify the dollar amount of that award or say when it should be paid. Dr. Freedenburg then noted this timely appeal and raises three questions, which we have reworded:

1. Was the trial judge clearly erroneous when he found that the conduct of Ms. Freedenburg alone was not the sole cause of the dissolution of the marriage?

2. Did the trial judge misinterpret or misapply the law when he awarded temporary alimony to Ms. Freedenburg despite the uncontradicted evidence that her own misconduct was the sole cause for the marriage's dissolution?

3. Did the trial judge incorrectly calculate the value of real property when he excluded as marital debt two loans that Dr. Freedenburg claimed had been made to finance the down payment of real property?

Ms. Freedenburg filed a cross-appeal and asked (1) whether the trial judge erred in failing to award her permanent alimony and (2) whether the case should be remanded with instructions to consider a qualified domestic relations order ("QDRO"), and to express any other monetary award in a dollar amount.

## A. GENERAL BACKGROUND

Dr. Daniel Freedenburg (appellant) and Elinor Freedenburg (appellee) were married on October 2, 1971. On January 2, 1977, a son, Daniel Jefferson ("Daniel") was born to the marriage. The couple separated on September 19, 1993.

During the 22–year period that the parties lived together, the two enjoyed a very comfortable and economically secure lifestyle. That lifestyle included private schooling for Daniel, membership in a yacht club, expensive homes and motor vehicles, European travel, and frequent entertainment. Their lifestyle was made possible by Dr. Freedenburg's substantial earnings as a forensic psychiatrist. In the two years prior to the separation, Dr. Freedenburg averaged $200,000 annually

in income, and in the year of the separation (1993), he earned over $275,000.

Ms. Freedenburg graduated with a bachelor of arts degree in English from the University of Maryland in 1967, and five years later she was awarded a master of liberal arts degree from Johns Hopkins University. She considers herself to have "excellent" writing skills. Ms. Freedenburg worked as a secretary at the Johns Hopkins University during the first four years of the marriage. Thereafter she did community service and charitable work but did not have any salaried position outside the home until approximately one year after the separation, when, in the fall of 1994, she secured a job with Billings Temporary—where she worked as a temporary secretary. From January 1995 to the present, she has worked as a secretary-receptionist for the Brightwood Retirement Community. As of July 1997, her salary was $21,000 per annum.

In 1979 or 1980, Dr. and Ms. Freedenburg moved to a home on Jorrick Road, which is located on Gibson Island. They took up sailing and became members of the Gibson Island Yacht Club in the early 1980's. Daniel, the couple's son, attended the Gibson Island Country School.

When Daniel was 13, he was enrolled in St. Paul's, a private school located in Baltimore County. To reduce Daniel's need to travel, Dr. and Ms. Freedenburg bought a townhouse located on Strauff Road in Riderwood, Maryland, where the family stayed on weekdays during the school year. On weekends, holidays, and during the summer the Freedenburg family lived on Gibson Island.

Their next-door neighbors at the Jorrick Road address were Patricia and Arthur Cecil. Sometime in the early part of 1990, the Cecils moved to a new address on Stillwater Road on Gibson Island. Nevertheless, the Freedenburgs and the Cecils continued to be friends. In March of 1992, the two families went on a holiday to England.

During the trip to England, Ms. Freedenburg fell in love with Arthur Cecil. Later in the spring of 1992, Ms. Freedenburg and Mr. Cecil met secretly and announced their love for

one another. Between the spring of 1992 and May of 1993, Ms. Freedenburg and Mr. Cecil carried on a clandestine, yet chaste, affair. The two had frequent rendezvous where they would talk, embrace, and kiss. They did not engage in sexual relations, however, during this stage of their relationship.

As might be expected, Ms. Freedenburg and Mr. Cecil kept their love secret from their spouses. This explains why Mrs. Cecil, in the early part of 1993, called Dr. Freedenburg and told him that a home next door to theirs on Stillwater Road was about to be put up for sale. Mrs. Cecil believed that it would be nice if the Freedenburgs could once again be the Cecils' next-door neighbors. Dr. Freedenburg also thought such close proximity to the Cecils would be a good idea, as did Ms. Freedenburg. In her words, "I was in love with Art [Cecil] and knew I was in love with Art and . . . in my dream world state I wanted to be next door to him again, which was crazy." With Ms. Freedenburg's encouragement, and due to the fact that he had always wanted to live near the water, Dr. Freedenburg signed a contract in April 1993 to purchase the Stillwater Road property for $850,000. The contract was subject to the contingency that the contract would not be binding unless the Freedenburgs were able to sell their home on Jorrick Road. Thereafter, while still unaware of his wife's involvement with Mr. Cecil, and even though the Jorrick Road property had not yet been sold, Dr. Freedenburg withdrew the contingency and his contract to purchase the Stillwater Road property was accepted.

Ms. Freedenburg, in late May or early June 1993, confessed to her husband that she was in love with Mr. Cecil. Dr. Freedenburg asked his wife to try to work things out and to go to marriage counseling, but his efforts to salvage the marriage were unavailing. In September 1993, Ms. Freedenburg told her husband that she was still in love with Mr. Cecil, and the parties separated permanently.

Due to the aforementioned troubles in the marriage, Dr. Freedenburg put the Stillwater property in his name alone. A loan in the amount of $614,979 was made to Dr. Freedenburg

by the Old Lion Bank; this loan was secured by a mortgage on the Stillwater Road property signed by Dr. Freedenburg. According to Dr. Freedenburg's trial testimony, approximately $150,000 of a $200,000 down payment was made from the proceeds of two loans. The first loan was in the amount of $86,372 that was borrowed on a life insurance policy issued by Northwest Insurance Company. The Northwest Insurance Company policy was owned by Dr. Freedenburg's solely owned corporation, i.e., Daniel J. Freedenburg, M.D., Chartered. The second loan was in the amount of $64,000; this latter sum was raised by borrowing that amount from two insurance policies that were owned by Daniel. When Daniel was approximately three years old, he inherited income from a trust of which Dr. Freedenburg was the trustee. As a trustee, Dr. Freedenburg used income from the trust to pay the premiums on the policies. Dr. Freedenburg borrowed the cash value of the policies owned by Daniel to make a portion of the down payment on the Stillwater Road property.

In the spring of 1997, approximately six weeks before the hearing on the divorce, Dr. Freedenburg borrowed approximately $84,000 from NationsBank and secured the NationsBank loan by placing a second mortgage on the Stillwater Road property. According to Dr. Freedenburg's testimony, $64,000 of the NationsBank loan was used to pay back the monies borrowed from the life insurance policies owned by Daniel.

As previously mentioned, the parties separated on September 19, 1993. For one year after that separation, Daniel lived in the condominium located on Strauff Road in Riderwood. From Monday to Thursday, Dr. Freedenburg lived with Daniel in Riderwood while Ms. Freedenburg lived in the marital home on Gibson Island; from Friday to Sunday Ms. Freedenburg lived at the Riderwood address with Daniel, and Dr. Freedenburg lived on Gibson Island. This arrangement allowed Daniel to stay in one place and minimized the disruption in his life caused by his parents' marital problems. After one year, however, Dr. Freedenburg moved back permanently to Gibson Island and Ms. Freedenburg moved into the condomin-

ium in Riderwood, with Dr. Freedenburg paying the mortgages on the Riderwood condominium and the Stillwater Road property. He also paid the mortgages on the Jorrick Road home—until it was finally sold more than two years after the parties separated.

Almost immediately after the separation, Ms. Freedenburg began to have a sexual relationship with Mr. Cecil. According to her testimony at the divorce proceedings, the two still date regularly, with Mr. Cecil frequently spending weekend nights at her condominium in Riderwood. Dr. Freedenburg, in turn, began to date one Gale Ennis in the summer of 1994. The two traveled together on occasion and developed a sexual relationship. Later, Dr. Freedenburg became involved with a Virginia Meade, and they too had sexual relations after the September 1993 separation of the Freedenburgs. Since the breakup of his marriage, Dr. Freedenburg, who was 53 at the time of his divorce, has had some health problems. In March of 1995, he experienced angina and discovered he had a 75% blockage of the left anterior coronary artery. Dr. Freedenburg underwent multiple coronary angioplasties to treat the blocked artery. He also had some problems with hypertension and control of his cholesterol. As a result of these health problems, Dr. Freedenburg has been instructed by his physicians not to exceed a 40–hour work week. Ms. Freedenburg, age 51 at the time of the divorce, is in good health.

## B. MARITAL PROPERTY

At the time of the divorce hearing, the parties owned 25 items of marital property. As he was required to do, the trial judge evaluated each item of marital property; he also evaluated the marital debt. In the trial judge's opinion, the value of the home located on Stillwater Road on Gibson Island was $850,000. The marital debt on the Stillwater Road property, according to the trial judge, was $614,979, which was the amount of the first mortgage. The trial court did not, however, include as marital debt the approximately $150,000 which Dr. Freedenburg borrowed on his two life insurance policies and the policies owned by Daniel.

The total value of all marital property, after giving Dr. Freedenburg a "Crawford Credit"[1] in the amount of $38,134 and after deducting marital debt, was $1,651,774. Of that total, $52,613 was titled in Ms. Freedenburg's name alone, and $120,203 was equity in property titled either in the names of Dr. Freedenburg and Ms. Freedenburg jointly, or as tenants by the entirety. Most of the marital property that was in Dr. Freedenburg's name alone was in various pension plans. The value of these plans was $1,226,875.

The trial judge provided no explanation as to his reason for making the division of marital property in the way he did. He simply said: "The court has considered all applicable factors in deciding a marital property award and will award to the wife (45%) of the remaining assets of the marital property after payment of the marital debt previously found."

In her brief, Ms. Freedenburg interprets the trial judge's written order literally, which requires Dr. Freedenburg, after deduction of marital debt, to pay Ms. Freedenburg 45% of the value of all assets that are deemed to be marital property— even assets that are already in Ms. Freedenburg's name alone or in the name of the parties jointly or as tenants by the entirety. Although there is no way to be sure, this may not have been intended by the trial judge.[2]

---

1. A "Crawford Credit" is a credit that one co-tenant, who, after separation, lays out money to make mortgage payments or other carrying charges on property held as tenants by the entireties, is usually entitled to receive, absent an agreement between the parties. *Crawford v. Crawford*, 293 Md. 307, 443 A.2d 599 (1982). Prior to a divorce decree, the entitlement of a spouse to such credits is an equitable matter and not a matter of right. *Broseus v. Broseus*, 82 Md.App. 183, 192, 570 A.2d 874 (1990).

2. In *Ward v. Ward*, 52 Md.App. 336, 449 A.2d 443 (1982), we explained:
 The monetary award is thus an addition to and not a substitution for a legal division of the property accumulated during marriage, according to title. It is "intended to compensate a spouse who holds title to less than an equitable portion" of that property.... What triggers operation of the statute is the claim that a *division* of the parties' property according to its title would create an inequity which could be overcome through a monetary award.
 *Id.* at 339–40, 449 A.2d 443 (citation omitted).

## C. FAULT THAT LED TO THE ESTRANGEMENT OF THE PARTIES

The trial judge said at the conclusion of the hearing:

I'm also going to say ... that contrary to [Dr. Freedenburg's] argument, I find as the court did in *Bangs* and in *Wallace*, that the subsequent adulteries of both the parties were incidental too and not the cause of the breakup of, the dissolution of the marriage.

I couldn't help but to think when the testimony first started with Mrs. Freedenburg where ... [she] talked about the problems of the voyage on the boat. I don't know what goes into the breakup of a 20–some–year marriage, but it wasn't only an intellectual, at first, and then later physical attraction to the next-door neighbor. There's a lot more that goes into it.

So the award will be on that basis. The rest of the thing that had been outlined by counsel I'll take in numerical order and set forth in an opinion and order that I will get out to you as soon as I can.

The court's reference to the "voyage on the boat" related to testimony by Ms. Freedenburg that in the early 1980's the parties purchased a sail boat that was used mainly for "day sailing." They were part of a yacht squad and also sometimes went on weekend sail boat outings. According to Ms. Freedenburg, "I was new to sailing. I wasn't natural at it. So we had some captain and mate stress conflicts, I'd say. I don't know how typical it was, but it could be stressful." Other than this rather fleeting reference to "captain and mate stress

---

We can think of no equitable reason why the trial court would want to give a spouse a monetary award based on a percentage of the value of property that was already in the receiving spouse's own name, or was in the name of the husband and wife jointly. In the case at hand, 45% of the $1,651,775 is $743,298.75. Because Ms. Freedenburg is already entitled to one-half of the jointly owned property (50% of $120,203) and *all* of the property titled in her own name ($52,613), if the court's order is read literally, Ms. Freedenburg would receive a total of $856,013.25 ($743,298.75, plus $60,101.50, plus $52,613). Dr. Freedenburg's share of marital property would be $795,761.75, or $60,-251.50 less than Ms. Freedenburg would receive.

conflicts" in the "early '80's," Ms. Freedenburg's trial testimony is remarkable in that she never either explicitly or implicitly blamed Dr. Freedenburg for any marital discord. In fact, other than the aforementioned "captain-mate" discord, she never testified to any discord at all. She was asked how Dr. Freedenburg treated her in the period between 1989 and 1993. She replied:

> He is very bright, and along with that brightness comes a certain amount of arrogance. I mean he pretty much ran the show. I'd say in our own home setting, you know, it just—he ran the show pretty much.

Immediately after this answer, the trial judge asked: "He was sort of the captain of the ship, like he was on the sailboat?" That question was ignored, and Ms. Freedenburg's counsel segued to another subject without ascertaining from Ms. Freedenburg whether the fact that her husband was bright, yet arrogant, and "ran the show at home" in any way annoyed her or in any way lead to the estrangement of the parties.

## D. ALIMONY AWARD

In his written order dated August 14, 1997, the trial judge said:

> Alimony, the court finds, should be rehabilitative and not permanent. The court has considered all the relevant factors and awards the wife alimony in the amount of five thousand dollars ($5,000) per month for a period of sixty (60) months. The court also finds that the husband owes twenty-seven thousand three hundred ninety four dollars ($27,394) in past alimony, and so orders this to be paid.

The trial judge did not give any hint as to how he arrived at the $5,000–a–month alimony figure nor did he give his reasons as to why he thought permanent alimony was unjustified.

Additional facts will be set forth as necessary to answer the questions presented.

## ISSUE I

■ Appellant argues that the trial judge was clearly erroneous when he concluded that the romance between Ms. Freedenburg and Mr. Cecil was not the sole cause of the dissolution of the marriage. Appellant posits that there simply was no basis in the record to support that factual finding. Moreover, Dr. Freedenburg argues—and we agree—that this finding of fact was an important one because "the circumstances that contributed to the estrangement of the parties" is a factor that the legislature has set forth as a fact that must be evaluated in determining alimony (Md.Code Ann., Fam. Law § 11–106(b)(6) (Supp.1998)) and the amount, if any, of a monetary award (Md.Code Ann., Fam. Law § 8–205(b)(4) (8.1997)). Here, the judge explicitly stated that "his award" would be made on the basis of his finding that Ms. Freedenburg's infatuation with Mr. Cecil was not the sole cause of the marital breakup.

This case is unusual in that Ms. Freedenburg was perfectly candid—even when the answers she gave did not help her case. She made it clear that the estrangement of the parties *was caused* by her infatuation with Arthur Cecil. Ms. Freedenburg was the spouse who desired both a monetary award and an award of alimony, and therefore, if she wanted the court to believe that some conduct on the part of her husband contributed to the estrangement of the parties, she had the burden of proving it. In her testimony, after making it clear that the estrangement was caused by her love for Mr. Cecil, her counsel never asked her if there was any other reason for the estrangement—and Ms. Freedenburg never volunteered any such reason.

Appellee points to the testimony that her husband was "bright" but "arrogant" and that during the marriage he "ran the show pretty much." The court, of course, was free to believe that testimony. But that testimony in and of itself was irrelevant unless there was some evidentiary link between Dr. Freedenburg's personality traits and the estrangement of the parties. There was no direct testimony establishing such a

link. Ms. Freedenburg never testified that Dr. Freedenburg's personality or actions changed during the course of the marriage or that she minded his "take charge" or arrogant ways. Nor was there any circumstantial evidence from which it could be logically inferred that Dr. Freedenburg's personality was a cause of the marital breakup. Experience teaches that many spouses are quite content with self-assured, even arrogant mates, who "take charge." Prominent "mates" who fit this mold but nevertheless had long and happy marriages are General Douglas MacArthur (second marriage) and Queen Victoria. While it is certainly possible that arrogant, take-charge spouses *may* cause the breakup of marriages, there is no way it properly can be inferred [3] from testimony such as Ms. Freedenburg's.

Appellee argues:

Even though husband refuses to recognize it, his arrogance and domineering character led to the demise of the marriage. When Wife testified that the parties had "captain and mate stress conflicts," and the trial judge referred to "problems on the boat," they were using a fairly common metaphor that explained the reason for the breakup of the marriage.

The court specifically linked husband's behavior on the boat to his role in the marriage. . . .

While Ms. Freedenburg did testify as to "captain-mate stress conflicts," she was answering a question dealing with a problem that she and her husband had "in the early" 1980's when the two sailed together. She did not indicate, metaphorically or otherwise, that the "captain-stress conflict" contributed to the marital breakup.

Appellee also contends:

By granting the divorce to [w]ife on the grounds of mutual and voluntary separation, the trial judge accepted

---

**3.** For the validity, *vel non,* of an inference, see *C & P Telephone Co. v. Hicks,* 25 Md.App. 503, 524–25, 337 A.2d 744 (1975).

the argument advanced by ... counsel for [w]ife [which was:]

> I believe that my client's relation-ship with Mr. Cecil was due in part to the personality of both people. And I'm not here to malign anyone. I am no day at the beach myself. Time has a way of taking a toll on all of us here. And it took a toll on this marriage. And I think you see the symptom of the difficulty rather than the difficulty.

The trial judge very well may have adopted the foregoing argument by counsel for appellee. The trouble is there was no evidence in the record to support such an argument. Under these circumstances, we hold that the trial judge was clearly erroneous in concluding that Ms. Freedenburg's relationship with Mr. Cecil was not the sole cause of the estrangement of the parties.

Because both the decision as to the marital award and alimony were affected by this erroneous finding of fact, both judgments must be vacated. Moreover, the issue of whether attorney's fees should be awarded to appellee is so intertwined and interrelated to the issue of alimony and monetary award that the vacation of a judgment as to either alimony or monetary award usually requires the lower court to also reconsider counsel fees. *See Doser v. Doser*, 106 Md.App. 329, 335–36 n. 1, 664 A.2d 453 (1995). In the case *sub judice*, we can see no reason to deviate from this rule.[4]

---

**4.** There was no showing that Ms. Freedenburg was unable to meet her needs and pay her attorney's fees. Even disregarding the monetary award, she owned substantial non-marital property in her own name (T. Rowe Price account and a NationsBank money market account worth over $184,000). This is significant, because in *Lemley v. Lemley*, 109 Md.App. 620, 675 A.2d 596 (1996), we said:

> In addition, *Foster[ v. Foster*, 33 Md.App. 73, 364 A.2d 65 (1976) ], the case cited by the chancellor as controlling, states that for an award of attorney's fees to be proper, a fact based evaluation of the financial resources and needs of each party must indicate that Mrs. Lemley's income is insufficient to care for her needs. Although the chancellor does mention in his order that the litigation expenses are extensive, the record does not indicate, nor does the chancellor state, that Mrs. Lemley's income is insufficient to meet her needs and pay her attorney's fees.

## ISSUE II

Dr. Freedenburg argues that the trial court improperly interpreted and applied the law in awarding alimony in this case. According to appellant, the case of *Flanagan v. Flanagan*, 270 Md. 335, 311 A.2d 407 (1973), prevented the trial court from making any alimony award to Ms. Freedenburg. Because the case must be remanded and because it is likely that this issue will recur, we will address Dr. Freedenburg's argument.

Appellant points to the following sentence in the trial judge's oral opinion:

> I'm going to say the factual finding, that contrary to [appellant's counsel's] argument, I find as the court did in *Bangs* and *Wallace,* that the subsequent adulteries of both of the parties were incidental to and not the cause of the breakup of, the dissolution of the marriage.

As previously mentioned, Ms. Freedenburg testified that she never had sexual relations with Mr. Cecil prior to the separation between the parties. The trial judge believed that testimony, as he was entitled to do. Similarly, the trial judge also believed Dr. Freedenburg's testimony that his adulterous relationship with two women only commenced after the September 19, 1993, separation. Given that factual finding, the conclusion was inescapable that adultery had nothing to do with the parties' breakup. No one quarrels with this proposition. But Dr. Freedenburg nevertheless argues that the facts in *Bangs v. Bangs,* 59 Md.App. 350, 475 A.2d 1214 (1984), and in *Wallace v. Wallace,* 290 Md. 265, 429 A.2d 232 (1981), are in many respects different than those in the case at hand, and thus the trial judge misinterpreted those cases.

It is true that neither the *Bangs* nor the *Wallace* cases are on "all fours" with the subject case. There was, however, one common denominator in *Bangs, Wallace* and this case, viz: The court found in each that the post separation adultery of at least one spouse was incidental to and not the cause of the

*Id.* at 634, 675 A.2d 596 (footnotes omitted) (citation omitted).

dissolution of the marriage. The trial judge undoubtedly was referring to this common denominator when he made his reference to the *Bangs* and *Wallace* cases.

*Bangs* and *Wallace* were decided after *Flanagan*. Appellant reads *Flanagan* as prohibiting a court from awarding any alimony to a spouse if the sole cause of the dissolution of the marriage is the spouse's adultery or abandonment. As the appellant points out, the Court of Appeals said in *Flanagan:*

> However, in those suits in which the actions of the party seeking such a pecuniary award *constitute the sole cause for the demise* of the marriage, and this wrongdoing consists of acts which are either *adultery or abandonment, then, except in rare instances where there exist extremely extenuating circumstances, the award of any alimony would be an abuse of discretion.* We have designated adultery and abandonment not on a whim, but because these are the only direct culpatory deeds that the Legislature has selected by name which either authorize or can ripen into grounds for an *a vinculo* divorce thereby indicating that it considers them the more heinous of the acts which can terminate a marriage. But, if there exists separation causing culpability other than adultery or abandonment on one side, or fault on both sides which caused the separation of the parties, the chancellor should consider the parties' *degree of blame* as well as their relative guilt in those cases where applicable and, in conjunction with the factors quoted earlier in this opinion, decide upon the proper award. In this thought process, the greater degree of fault on the part of the wife demonstrated, the greater the need which she must show to entitle her to an award of alimony appropriate to the circumstances otherwise existing.

*Flanagan,* 270 Md. at 341–42, 311 A.2d 407 (emphasis added).

Dr. Freedenburg contends that the demise of his marriage was caused by either abandonment or adultery on the part of Ms. Freedenburg, and thus the *Flanagan* case is on point. As already pointed out, Ms. Freedenburg's adultery did not cause the breakup of the marriage. Moreover, there was no proof that she "abandoned" her husband as that term

is used in *Flanagan.* The evidence in this case shows that after September 19, 1993, the separation was accomplished by the spouses utilizing their multiple homes so that each could live part-time with their son at their Strauff Road condominium while the other lived on Gibson Island. At trial, an agreement executed by the parties on November 24, 1993, was introduced into evidence as Defendant's Exhibit 1. In Defendant's Exhibit 1, the parties acknowledged that they had "by mutual and voluntary consent" separated on September 19, 1993, with the "intent of ending their marital relationship." A party who consents to a separation has not been abandoned. *See Ches v. Ches,* 22 Md.App. 475, 487–88, 323 A.2d 651 (1974). There was no evidence to contradict the words used in the agreement.

But even if appellant had proved that the demise of the marriage was caused by Ms. Freedenburg's adultery and/or abandonment, appellant's reliance on the 1973 *Flanagan* case would be misplaced. On January 18, 1980, the Report of the Governor's Commission on Domestic Relations was issued. The Commission, commenting upon the status of the law as it existed in 1980, said:

"Fault," in the sense only of the existence of a ground for divorce against the party seeking alimony, works an absolute forfeiture of entitlement under existing law; the Commission's proposal would eliminate the automatic forfeiture, but would not eliminate fault as a factor which the Judge would consider as one of the facts and circumstances leading to the dissolution of the marriage or the estrangement of the parties.

The Commission believes that those facts and circumstances not only are a factor that will inevitably be considered by the Courts; it believes also that they should be considered . . . .

. . .

The Commission does not believe that vice or fault should be rewarded. However, it also does not believe that the Judges of Maryland should be deprived of the opportunity and responsibility to apply their sound discretion to all

parties who appear before them, and to weigh the "fault" as against the need and any countervailing equities of a party in need of support. The Commission believes that the present situation, where the vice of the payor is winked at and only the conduct of the needy spouse is the criterion, is inequitable. Our proposal, accordingly, empowers the Court to take into account the whole situation of the parties, and on that basis to act as is most fair.

John F. Fader, II & Richard J. Gilbert, *Maryland Family Law* § 4–7(h)(2), at 151–52 (2d ed.1995) (citing Report of the Governor's Commission on Domestic Relations Law 5–6 (1980)) (footnotes omitted) (emphasis omitted).

■ The recommendations of the Governor's Commission were enacted into law effective July 1, 1980. *Id.* § 4–3(d), at 122. On that date, the Legislature removed fault as an automatic bar to spousal support. *See* Md.Code Ann., Fam. Law § 11–103 (1991 Repl.Vol.). Under the new law, the fact that a spouse was guilty of either abandonment or adultery would not necessarily prevent a trial court from granting alimony. *See Turrisi v. Sanzaro,* 308 Md. 515, 528 n. 6, 520 A.2d 1080 (1987); *Rock v. Rock,* 86 Md.App. 598, 605, 587 A.2d 1133 (1991).

Accordingly, we disagree with appellant's contention that the trial judge was prohibited from granting alimony based on the *Flanagan* case.[5]

### ISSUE III — LIFE INSURANCE LOANS AS MARITAL DEBT

Appellant argues that the trial judge erred by not including as marital debt loans that appellant had made in order to

---

5. Appellant spends several pages in his brief proving that, under current law, the facts and circumstances that contributed to the estrangement of the parties has a bearing on both alimony and the monetary award. Such argument was completely unnecessary because, as already mentioned, this is a statutory factor that must be considered. The trial judge said in his opinion that he did consider all the statutory factors relevant to alimony and monetary award, and we must assume that he did.

make the down payment on the Stillwater Road property. The loans that Dr. Freedenburg refers to in his argument are the $86,372 loan from Northwest Insurance Company and the $64,000 portion of the $84,000 loan he received from Nations-Bank. Dr. Freedenburg contends that he was entitled to have the two "loan" amounts deducted from the value of the Stillwater Road property as marital debt.

Appellant lumps both of the loans together in his argument, and apparently contends that they should be treated identically. We disagree with this approach.

■ The $86,372 that Dr. Freedenburg borrowed on his life insurance policy should not have been considered a loan for the purposes of totaling marital debt. According to *Couch on Insurance 3D,* "a policy 'loan' is actually an advance payment of the proceeds of insurance, rather than a true loan ..." Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3D* § 80:7 (3d ed.1996). Additionally, courts that have addressed whether money borrowed from an insurance company upon a policy creates actual debt have found that it does not. *See Schwartz v. Seldon,* 153 F.2d 334, 335 n. 3 (2d Cir.1945) ("Money borrowed from an insurance company upon the policy does not create a debtor and creditor relationship. The so-called 'loan' is really 'advancement' and merely reduces the amount the company must ultimately pay."); *see also Williams v. Union Cent. Life Ins. Co.,* 291 U.S. 170, 179–180, 54 S.Ct. 348, 78 L.Ed. 711 (1934) ("such advances being against the surrender value do not create a 'personal liability' or a 'debt' of the insured, but are merely a deduction from the sum that the company 'ultimately must pay.' While the advance is called a 'loan' and interest is computed in settling the account, 'the item never could be sued for,' and in substance 'is a payment, not a loan.' ").

At trial, Dr. Freedenburg testified that the professional corporation that he owned was the policy owner and the owner of its proceeds. Given that his professional corporation is appellant's solely owned property, it is apparent that he controlled any obligation to repay the loan. Therefore, the

$86,372 that Dr. Freedenburg "borrowed" did not constitute marital debt.

■ The $64,000 that Dr. Freedenburg borrowed on his son's insurance policies is distinguishable from his Northwest Insurance Company policy loan. According to Dr. Freedenburg's testimony, he was obligated as a trustee to repay the loans taken out on his son's policies. A part of the down payment came out of Daniel's money, and $64,000 of the $84,000 NationsBank loan was used to repay that loan.

From the point of view of the owner of the policies (Daniel), Dr. Freedenburg, as a trustee, borrowed $64,000 from him. If Dr. Freedenburg's testimony was believed, the monies borrowed met the legal definition of "marital debt"—namely "a debt which is directly traceable to the acquisition of marital property." *Schweizer v. Schweizer*, 301 Md. 626, 636, 484 A.2d 267 (1984). Based on Dr. Freedenburg's uncontradicted testimony, the monies borrowed on the son's policies were: (1) a debt for which Dr. Freedenburg carried personal liability; and (2) directly traceable to Dr. Freedenburg's purchase of marital property—the Stillwater Road property on Gibson Island.

It is true, however, as appellee points out, that the trial judge was not obligated to believe the testimony of Dr. Freedenburg. *See Shapiro v. Chapman,* 70 Md.App. 307, 318, 520 A.2d 1330 (1987) ("The trier of fact is not bound to accept the testimony of any witness even if it is uncontradicted."). But here we have no way of knowing what the trial judge believed in regard to this item of (alleged) marital debt. Upon remand, the issue of marital debt should be evaluated based on the principles outlined above.

### ISSUE IV

■ According to appellee:

The trial court erred in failing to award indefinite spousal support because there was an unconscionable disparity in lifestyles. The court ordered that alimony should be rehabilitative and not permanent. Wife was only awarded 60

months of alimony despite more than 20 years of marriage and an income which was only 10.5% of husband's income. The trial court also erred in failing to make specific findings of fact with regard to the income of the recipient spouse.

Taking the last point first, we agree with appellee. As already stated, the trial judge merely said that he considered all the factors set forth in Md.Code Ann., Fam. Law § 8–205 (Supp.1998). The same thing was done in *Scott v. Scott*, 103 Md.App. 500, 516–17, 653 A.2d 1017 (1995), where we disapproved and said:

> Additionally, we question the trial court's consideration of the factors contained in § 8–205(b) that must be considered by the court when determining the amount of the monetary award. The trial court listed each of the ten factors, and then stated:
>
>> Taking into account all of the factors in § 8–205(b), supra, including the award of alimony herein set forth, and the award of use and possession of the family income, as an adjustment of the equities, we grant a monetary award to the Wife in the amount of $100,000.00.
>
> We disapproved of this mere "lip service" the trial judge gave to the statutory factors in *Ward v. Ward*, 52 Md.App. 336, 343–44 [449 A.2d 443] (1982). On remand, the trial court should "articulate more clearly the basis for its decision to grant a monetary award." *Imagnu v. Wodajo*, 85 Md.App. 208, 222 [582 A.2d 590] (1990)....

There was expert testimony by a vocational adviser called as a witness by Ms. Freedenburg. This expert, Charles Smolkin, said that with some minimal (three or four day) job specific computer training Ms. Freedenberg would be eligible to earn $30,000 per year as an administrative secretary or supervisor. In Mr. Smolkin's report, which was entered into evidence by stipulation, he said that Ms. Freedenburg had the advantage of

> above average reasoning ability, current employment at which she demonstrated the ability to be promoted, a high educational level, diverse and sophisticated interests, and a professional appearance. Negative factors include a history

of depression which appears to be well-controlled through therapy and medication, a limited work history, and an education without a specific vocational focus.

He also referred in his report to an authority on occupation salaries that notes that the average annual salary for secretaries in metropolitan areas was $26,700 in 1993. He goes on to say that Ms. Freedenburg is currently functioning as a "supervisor and certainly has supervisory ability" and the same publication reveals that clerical supervisors had median annual earnings of $28,000 in 1994. The range for secretaries is from $19,100 to $38,400, while the highest ten percent of clerical supervisors and managers earn more than $47,200 per year.

Beside her income potential, Ms. Freedenburg has in her own name a T. Rowe Price account worth $159,000, two NationsBank money markets accounts worth a combined $55,018, a fifty percent interest in a Ferris Baker Watts account worth $10,000, and a fifty percent interest in an account, held jointly with Dr. Freedenburg, at A.G. Edwards worth $26,615. In addition, she owns 50% of $148,337 equity in the home located on Strauff Road. Ms. Freedenburg's share of the jointly owned property coupled with monies in her own name total approximately $235,000. If that money were invested and the return was at six percent, she would have additional annual earnings of $14,100, not counting potential income from the marital award, which, if read literally, was generous in the extreme. *See supra* note 1.

Because we are in the dark (1) as to what future income the trial judge thought Ms. Freedenburg would have and (2) as to the exact amount of the marital award, we are unable to decide whether the trial judge erred in failing to award Ms. Freedenburg permanent alimony. Upon remand, in resolving the issues as to permanent alimony, whether the trial judge decides to grant or deny permanent alimony, he should explain his reasons.

### ISSUE V

Finally, Ms. Freedenburg asserts that this case should be remanded with instructions to consider a QDRO and

to express any other marital award in a dollar amount. Both parties agree that the trial judge, on remand, should consider a QDRO. This is eminently sensible inasmuch as over $1.2 million worth of marital property that is in Dr. Freedenburg's sole name is made up of pension funds put aside for retirement. There would be dire tax consequences to both Dr. Freedenburg and Ms. Freedenburg if Dr. Freedenburg were required immediately to pay out forty-five percent of these pension funds to Ms. Freedenburg. Thus, a QDRO should be considered. Also, as Ms. Freedenburg contends, upon remand any other portion of the monetary award must be expressed in dollar terms and reduced to a judgment. *See* Md.Code Ann., Fam. Law § 8–205(c) (Supp.1998). The court should also specify when the monetary award should be paid. *See id.*

JUDGMENTS AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THE VIEW EXPRESSED WITHIN; COSTS TO BE PAID FIFTY PERCENT BY APPELLEE AND FIFTY PERCENT BY APPELLANT.