759 A.2d 1180

**Joseph George HEINLEIN**

v.

**Robin STEFAN.**

**No. 2205, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Sept. 29, 2000.

Mark P. Hanley, Jr., Towson, for appellant.

Melissa D. Gray, Towson, for appellee.

Submitted before MOYLAN, HOLLANDER and JOHN J. BISHOP (Ret., Specially Assigned), JJ.

MOYLAN, Judge.

When granting a divorce, a judge may unilaterally retain jurisdiction over yet unresolved marital property issues for an additional period of 90 days if in the divorce decree itself that reservation of jurisdiction is expressly made. For that reservation of jurisdiction to extend beyond 90 days, however, it is required that both parties to the divorce consent to such a further extension. The precise issue before us, assuming otherwise valid consent by the parties, is that of what, if any, time constraints there are on the act of giving formal consent. As an incident of resolving that question, we will revisit the never-ending riddle of what, if any, significance to give to words, phrases, or sentences that may appear in appellate opinions.

The immediate concern of this appeal is with the authority of the Circuit Court for Baltimore County to distribute marital property following the absolute divorce of the appellant, Joseph George Heinlein, and the appellee, Robin Stefan. The sole issue is whether, after the lapse of 90 days, the court lost jurisdiction to engage in the distribution of marital property.

### The Formal Proceedings

On July 11, 1995, the appellee filed a Complaint for a Limited Divorce, later amended to constitute a Complaint for an Absolute Divorce, in the Circuit Court for Baltimore Coun-

ty. The appellee sought custody of the parties' minor child, child support, a monetary award, and the division of marital property. The appellant filed a Counter Complaint for Absolute Divorce on October 17, 1996. The trial on the merits took place on September 23, 1998, before Judge Barbara Kerr Howe. The issues of custody, visitation, and child support were resolved. The marital property question remained unsettled. At the conclusion of the trial, Judge Howe reserved jurisdiction and then cautiously advised:

> It is my understanding that the marital property issues which have arisen from the union of Miss Stefan and Mr. Heinlein are reserved for future determination by the Court. *We would hope to have these matters scheduled within the next 90 days, but absent that,* due to scheduling purposes, *I have asked that counsel obtain the signatures of each party to this case so that we don't violate* the Family Law Article and *the rules which* would *require* and demand of me *that I determine those issues within 90 days* indicating, again, we hope to get them in within 90 days and fully and finally litigated and resolved, and *I now have that agreement to extend the time by consent beyond the 90 days from the date of divorce absolute and for reservation of my authority to make such a determination.*

(Emphasis supplied).

Pursuant to the advice and request of Judge Howe, on September 23, 1998, the following "Consent to Reservation of Jurisdiction for Purpose of Determining Marital Property" ("Consent Agreement") was signed by both parties:

> *The parties* hereto ... pursuant to Family Law Article, § 8–203(a), hereby *consent to an extension time in which this Court shall determine the marital and non-marital property* of the parties in conjunction with their action for absolute divorce, as well as any monetary award *beyond ninety (90) days from the date of any absolute divorce* between the parties *and further consent to a reservation of the Court's authority to make such a determination.*

(Emphasis supplied). On April 27, 1999, the written "Judgment of Absolute Divorce" was signed by the court and docketed.

After the entry of that written divorce decree, the parties engaged in battle over whether the court still had jurisdiction to decide issues of marital property distribution. The appellee contended that, by virtue of the September 23, 1998, Consent Agreement, the parties had agreed to extend Judge Howe's authority to resolve marital property issues beyond ninety days from the date of any divorce decree. The appellant, on the other hand, contended that the Consent Agreement only had effect for ninety days from the date of the September 23, 1998, hearing and that a new and superseding "Consent Agreement" would have to have been signed by the parties following the April 29, 1999, written Judgment of Absolute Divorce and that no such new and superseding "Consent Agreement" had been signed.

On October 5, 1999, the appellee filed a "Motion to Reserve Jurisdiction of Court." The appellant responded by filing an "Answer to Motion to Reserve Jurisdiction of Court." On October 18, 1999, Judge Howe granted the appellee's Motion to Reserve Jurisdiction. The appellant responded with a Motion to Dismiss which was denied. This appeal followed.

## The Timeliness of Consent

The time period involved was more than 90 days after either September 23, 1998, or April 27, 1999. The consent of the parties was, therefore, an indispensable prerequisite to Judge Howe's extended jurisdiction over the marital property issues. The issue before us concerns the third requirement of § 8–203(a)(3) of the Family Law Article that "the parties consent to this extension." The precise language of the Consent Agreement signed by both parties on September 23, 1998, provides:

> The parties ... consent to an extension time ... *beyond ninety (90) days from the date of any absolute divorce* between the parties....

(Emphasis supplied). By that Consent Agreement the parties manifested their intent to give the court jurisdiction to decide marital property issues beyond the 90–day period following the entry of the judgment of an absolute divorce.

The appellant's only challenge to the consent is with respect to its timeliness. Although the resolution of the dispute will not be ultimately dispositive, there is a contextual dispute between the appellant and the appellee as to the precise date when the divorce became final and consequently when the initial 90–day period began to run. The appellee argues for September 23, 1998, when Judge Howe announced from the bench that she was granting the divorce. The appellant argues for April 27, 1999, the day the written Judgment of Absolute Divorce was signed by Judge Howe and docketed.

### "The old, old question of when is a judgment a judgment"

*Cedar Creek Oil and Gas Co. v. Fidelity Gas Co.*, 238 F.2d 298 (9 [th] Cir.1956), referred to "the old, old question of when is a judgment a judgment." The analytic framework for examining such a question in Maryland was established by Judge Raker in *Davis v. Davis*, 335 Md. 699, 646 A.2d 365 (1994). She there pointed out that granting a judgment is a two-step process:

> [T]wo acts must occur for an action by a court to be deemed the granting of a judgment: *the court must render a final order and the order must be entered on the docket by the clerk. These two required acts*—rendition of a judgment by the court and entry of the judgment by the clerk—*are discrete occurrences.* Rendition of judgment is the judicial act by which the court settles and declares the decision of the law on the matters at issue. In other words, rendition is the court's pronouncement, by spoken word or in open court by written order filed with the clerk, of its decision upon the matter submitted to it for adjudication. The second act required under Maryland law—the clerk's entry of the judgment on the docket—is the purely ministerial act

by means of which permanent evidence of the judicial act of rendering the judgment is made a record of the court.

*A judgment is therefore not granted until it is both properly rendered and entered.*

335 Md. at 710, 646 A.2d 365 (internal citations omitted; emphasis supplied).

### The Rendering of the Judgment

Typically, the dispute over whether an arguable judgment was actually a judgment is one of whether the judge's words at the conclusion of a hearing were intended to be and qualified as a valid "rendering" of a judgment. Judge Raker observed in that regard, 335 Md. at 710–11, 646 A.2d 365:

> *The determination* of whether a court has rendered judgment *turns on whether the court indicated clearly that it had fully adjudicated the issue submitted and had reached a final decision on the matter at that time.* In other words, *the trial court's ruling must be "an unqualified, final disposition of the matter in controversy."* There are, however, no formal requirements regarding the rendition of a judgment. As one court has observed, "[t]here are no hard and fast rules for determining what is a judgment." Rather, whether a judgment has been rendered in a particular case is an inquiry that must be made on a case-by-case basis and which focuses upon the actions and statements of the court.

(Internal citations omitted; emphasis supplied).

In this case we are fully persuaded that Judge Howe intended to "render" a judgment of divorce on September 23, 1998. Although the marital property issues had yet to be resolved at a future time and although "the consent agreement ... as to custody" had to be incorporated into the written judgment of divorce, the September 23 pronouncement from the bench bore every indication of intended finality.

> *I therefore grant* to Robin Stefan, Plaintiff, from the Defendant, Joseph George Heinlein *a Judgment of Divorce Absolute* and I request that Miss Gray prepare that Judg-

ment of Divorce Absolute incorporating into it the consent agreement reached between the parties today as to custody, visitation and other matters recited on the record.

*Any open costs will be divided equally between the parties so that that judgment may enter. I intend for it to be and order that it be a judgment that will enter upon the record,* understanding and knowing full well that it is only a partial judgment in this case, but *that it be entered as a final judgment.*

(Emphasis supplied).

The fact that a written Order of Absolute Divorce was subsequently signed on April 27, 1999, does not negate Judge Howe's intention on September 23, 1998, to render a final judgment of divorce. In that regard, *Davis v. Davis* was clear:

Although the court signed a formal written order on June 11, 1990 which stated that judgment of absolute divorce "is hereby granted," *the subsequent issuance of a formal written order does not preclude a finding that judgment was actually orally rendered on an earlier date.*

335 Md. at 713, 646 A.2d 365 (emphasis supplied).

A persuasive indication that Judge Howe intended her words of September 23, 1998, to be a final judgment of divorce was her statement with respect to the marital property issue yet to be resolved. When jurisdiction over such issues is reserved by the court, it normally has a statutorily mandated period of 90 days from the granting of the absolute divorce within which to act. Judge Howe clearly was measuring 90 days from September 23, 1998, and she explicitly referred to that period as "the 90 days from the date of divorce absolute."

*We would hope to have these matters scheduled within the next 90 days, ... I now have that agreement to extend the time by consent beyond the 90 days from the date of divorce absolute. ...*

(Emphasis supplied).

In *Davis v. Davis,* Judge Raker held that just such a reservation of jurisdiction over the marital property issue was

conclusive evidence of the trial judge's intention to render an absolute judgment of divorce from the bench.

> [T]he trial judge further stated that "The Court reserves ... the authority under the statute to make a marital award" for a period of ninety days. *The court's express reservation of a ruling upon marital property issues for a ninety-day period pursuant to § 8–203(a) factors significantly in our conclusion that the court did in fact intend to render an unqualified, final judgment of divorce on February 28.* ... If the court did not intend to render the judgment of divorce on February 28, there would have been no reason for the court, at that time, to reserve the power to make a marital property distribution. *We find that the reservation of the power to rule on the marital property issues is strong evidence that the court intended to grant Mr. Davis an absolute divorce on February 28.*

335 Md. at 712, 646 A.2d 365 (emphasis supplied).

### The Docketing of the Judgment

█ Notwithstanding what to us seems to have been the unequivocal intention of Judge Howe to render a final judgment of divorce on September 23, 1998, we nonetheless agree with the appellant that the divorce did not become final until April 27, 1999. That is because the indispensable second step for the finalization of the earlier ruling was never accomplished. The clerk's docket entry for September 23, 1998, reads simply:

> Hon. Barbara Kerr Howe. Hearing had. Case, as to custody only, settled on the record. Order to be filed. Testimony taken. Open court costs to be divided between the parties.

Although we believe it to have been clearly intended, a final judgment of divorce was never docketed. Under the unmistakable mandate of *Davis v. Davis,* 335 Md. at 710, 646 A.2d 365, that was a fatal flaw in terms of finality.

## The Consent, If Good Initially, Did Not Lapse

Judge Howe's articulate "rendering" of what purported to be a judgment of divorce on September 23, 1998, however, is nonetheless important because of the interpretive light it shines on the mutual consent agreement signed by both parties on that same day. That agreement was no mere tentative or interim provision. It was an open-ended consent to the continuing jurisdiction of the court over the marital property issues. It had no termination date.

■ To the extent to which the appellant argues that the consent to continuing jurisdiction, good at the outset, somehow lapsed and that a new consent agreement was necessary after the docketed final judgment of divorce on April 27, 1999, we reject the argument as meritless. The consent agreement was that the court would retain jurisdiction over the marital property issues even after 90 days from the judgment of divorce had passed. It does not matter, therefore, whether the 90 days is measured from September 23, 1998, or from April 27, 1999. Whatever is more than 90 days after April 27, 1999, is *ipso facto* more than 90 days after September 23, 1998. The earlier consent covered all later time and needed no booster shot.

## A Front–End Time Limitation?

■ Although it is by no means clear, the appellant may be making an alternative argument that the consent was void *ab initio* because it was premature. As we attempt to frame the argument that the appellant may be making, it seems to be as follows: That the valid consent to a judge's continuing jurisdiction is framed not only by a terminal point, **beyond which** it may not be executed, but also by an initial point, **before which** it may not be executed. The argument seems to be that there is a narrow window for the effective execution of such a consent agreement and that a purported consent agreement will be ineffective not only if it comes **too late**, but also if it comes **too early**. The appellant seems to argue that

that narrow window of opportunity is the 90 days following the literal final judgment of divorce.

If that is the argument, it is a creative one. We cannot agree, however, that it has merit. The argument, as we construe it, begins with the proposition that the final decree of divorce was not handed down until April 27, 1999. Its minor premise is that the consent agreement that was executed on September 23, 1998 preceded that judgment of divorce by approximately seven months and, therefore, was not executed within a 90–day period **following** April 27, 1999. That being the case, the argument runs, the consent by the parties did not satisfy the statutory requirement of consent and was, therefore, a nullity.

### Section 8–203(a)

On the subject of "consent to the extension," the controlling statute is § 8–203 of the Family Law Article. Subsection (a) confers on the court the authority to "determine which property is marital property." There are then set out three times at which or time periods within which the court may make such a determination. Subsection (a)(1) provides that the court may make the marital property determination **at the time** the court "grants an annulment or an absolute divorce." There are no conditions or limitations placed upon the judge's authority to make the determination at that time. It is simply inherent in the court's authority to decide the divorce case.

Subsection (a)(2) then deals with the period of **the first 90 days following** the court's granting of an absolute divorce. It provides that the court may still make a determination as to which property is marital property. It places on that authority, however, the precondition that the court shall have expressly reserved in the annulment or divorce decree itself the power to make such a delayed determination. Without such a reservation, the court may not act. If the court has made such a reservation, however, its authority to act within the initial 90–day period is unilateral. No consent is required of either party to the divorce action.

Subsection (a)(3) then deals with the third and final time period, the time **"after the 90–day period."** That period stretches endlessly from the 91 [st] day to an open-ended future. The court's authority to act beyond the 90 [th] day, however, is cabined in by three pre-conditions. It is required, just as it is required within the initial 90–day period, that the court in its grant of the divorce decree itself shall have reserved its authority to make a delayed determination. There are then two additional pre-conditions. For our present purpose, that of reading legislative intent, the punctuation of subsection (a)(3) becomes important. Subsection (a)(3) gives the court the authority to "determine which property is marital property":

(3) after the 90–day period if:

(i) the court expressly reserves in the annulment or divorce decree the power to make the determination;

(ii) *during the 90–day period,* the court extends the time for making the determination; and

(iii) the parties consent to the extension.

(Emphasis supplied).

The appellant's argument would like to establish a limited window for the executing of a valid consent by the parties, circumscribing that window by the phrase "during the 90–day period." We cannot, however, read such a limitation into the consent provision of subsection (a)(3). That subsection sets out three conditions, each neatly set off from the others by a semi-colon. We read the adverbial phrase "during the 90–day period" to apply only to the second of the three pre-conditions, to wit, to the court's extension of its "time for making the determination." The punctuation is dispositive as to legislative intent. The adverbial qualifier is nestled snugly within the second pre-condition and is fenced off from the third pre-condition by a semi-colon. That temporal limitation does not apply to the third pre-condition, to wit, to the execution by the parties of their "consent to the extension."

### How Not To Read An Appellate Opinion

The appellant, however, seeks solace in some casual *dicta* in the opinion of this Court in *Ticer v. Ticer,* 63 Md.App. 729, 493 A.2d 1105 (1985). Actually, the *locus* of the solace that is sought is not even in *dicta;* it is in the casual, and, we hold, inadvertent use of a passing phrase. In analyzing the validity of consent, three times in that opinion we, to be sure, used the phrases "during the ninety-day period," 63 Md.App. at 736–37, 493 A.2d 1105, or "during the 90 days." 63 Md.App. at 737, 493 A.2d 1105.

As a lexical abstraction, the preposition "during" may seem to preclude **all time preceding** as well as **all time succeeding** the time period that is the object of the preposition. Noah Webster notwithstanding, our random use of the preposition in the *Ticer v. Ticer* opinion will not carry such heavy baggage. Our explanation of our decision in that case would have been precisely the same if, by choice of words, we had used the phrase "not after the 90–day period" rather than "during the 90–day period." Indeed, the fact that the consent in that case came "after the 90–day period" was the only issue that was on the mind of the Court in *Ticer v. Ticer.*

In *Ticer v. Ticer,* to be sure, we may have said "during" rather than "not after," but in *State v. Wilson,* 106 Md.App. 24, 39, 664 A.2d 1 (1995), *rev'd on other grounds,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), we also said:

> *[S]tare decisis* is ill served if readers hang slavishly on every casual or hurried word as if it had bubbled from the earth at Delphi.

It is tempting, particularly when it serves one's purpose, to ascribe oracular significance to what may be nothing more than stylistic happenstance in an opinion's wording, but that is not the way the opinion writing business works. The other members of an appellate panel scrutinize with painstaking care the opinion writer's articulation of the actual decision in a case. That is why in Anglo–American jurisprudence actual holdings are given precedential status. The other panel members, however, do not hover critically over every word of an

opinion writer's phraseology as if it were being chiseled in marble. For that matter, neither does the opinion writer. When the narrative juices are flowing, a writer's ultimate choice of words is frequently nothing more than a subliminal stylistic reflex.

Why then, the stolid automaton may ask, did the *Ticer v. Ticer* opinion say "during the 90–day period" rather than "not after the 90–day period" if that is not precisely what the Court meant? The answer is that no one knows. It may have been because the two-directional limit of "during" was broad enough to embrace the one-directional limit of "not after," the only time constraint that was being considered in that case. No one was remotely thinking about a time constraint in the other direction.

That being true, the choice of words may have been dictated, consciously or subliminally, by nothing more profound than an artistic judgment that the word "during" seemed somehow more felicitous, that it simply rolled from the tongue more euphoniously, than the staccato phrase "not after." It is a literary truism that one word, when it will serve, is always preferred over two.

What we are trying to communicate is that in a context where it makes no apparent critical difference at that moment, an opinion writer's choice of words may be more a matter of art than a considered legal judgment and is, therefore, not precedential authority for anything.

### The Holding of *Ticer v. Ticer*

The thrust of our holding in *Ticer v. Ticer* was that the "statute does not allow the parties to confer jurisdiction on the court by consent." 63 Md.App. at 737, 493 A.2d 1105. If, as in the *Ticer* case, the court has reserved jurisdiction over the determination of marital property but then fails to make that determination within the initial 90 days, the court loses jurisdiction over the case unless the time period has been properly extended, with the consent of the parties, before jurisdiction lapses.

In *Ticer v. Ticer,* the consent of the parties to the extension of the time period came too late. The court had already lost jurisdiction over the case and the parties could not, even by an act of mutual consent, restore the court's lost jurisdiction. We held, 63 Md.App. at 736, 493 A.2d 1105:

> In the present case, the court attempted to reserve the issue beyond the statutory period, but the parties did not consent to the extension during the ninety-day period.... [T]he parties failed to comply with the requirements necessary to extend the time beyond the statutory period: the sanction of prohibiting the court from acting, therefore, is appropriate.

Our only concern in *Ticer v. Ticer* was that the consent came too late, to wit, **after** the expiration of the initial 90–day period. The final holding of this Court was clear:

> Although the [1982] amendment [to the statute] allowed an extension upon consent, *none was given in this case until after the 90 days had expired;* the sanction, therefore, was not avoided.

63 Md.App. at 738, 493 A.2d 1105 (emphasis supplied). *Ticer v. Ticer* was only concerned with the terminal point for consenting to an extension, beyond which point the jurisdiction of the court would lapse. *Ticer v. Ticer* cannot now be deemed to stand for a legal proposition which it never remotely considered and which it was never called upon to consider.

### There Was No Front–End Time Limitation

Neither the statute nor the case law establishes any front-end temporal limitation on the giving of valid consent to an extension of the trial court's jurisdiction beyond the initial ninety days. We decline to create, by strained interpretation, any such limitation.

Judge Howe fully intended her words at the conclusion of the September 23, 1998 hearing to be a final judgment of divorce. It is clear that both parties fully understood the same thing, notwithstanding the subsequent failure of the clerk to make a docket entry to that effect. It was the clearly

stated intention of Judge Howe to make her determination as to marital property within "the next 90 days," which she construed to be the period of "90 days from the date of divorce absolute." The exchange of correspondence between the parties and the efforts to find a mutually convenient hearing date all indicated that that was the consensus understanding of the court and the parties alike. As Judge Howe requested of the parties, they freely and voluntarily consented to an extension of the court's jurisdiction to cover the eventuality that the marital property issues might not be wrapped up within the first 90 days.

There were clearly no time limitations on that consent in the mind of anyone and it would be the exaltation of form over substance to strain to find one in this case. The consent was valid and the judgment of the trial court is hereby affirmed.

*JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.*