798 A.2d 1195

Mark C. STEINHOFF

v.

A. Elisabeth SOMMERFELT.

No. 0385, Sept. Term 2001.

Court of Special Appeals of Maryland.

May 31, 2002.

464

Harry B. Siegel, Columbia, for appellant.

Larry Polen, Towson, for appellee.

Argued before KENNEY, KRAUSER, and CHARLES E. MOYLAN, Jr. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Judge (Retired, Specially Assigned).

This appeal requires us to take a close look at the time limits prescribed by Maryland Code, Family Law Article, § 8–203 on the designating of marital property and on the sanction, if any, for a violation of those prescribed deadlines.

The appellant, Mark Steinhoff, and the appellee, A. Elisabeth Sommerfelt, were divorced by a Judgment of Absolute divorce issued by Judge Raymond Kane, Jr., in the Circuit Court for Howard County on October 12, 2000. On this appeal, the appellant raises the three contentions

1. that Judge Kane erroneously granted a monetary award to the appellee;

2. that Judge Kane erroneously granted counsel fees and costs to the appellee, while failing to rule on the appellant's request for counsel fees; and

3. that Judge Kane earlier erred in granting alimony *pendente lite* to the appellee.

## Factual Background

The appellant and the appellee were married in Valparaiso, Indiana on October 21, 1972. Three sons were born of the marriage. Eirik, the oldest, born in 1974, had left home by the time of the divorce. The second, Kristoffer, born in 1979, was in his second year at the University of Chicago. The third, Andreas, born in 1983, was a senior in high school at the time of the trial in this case and turned eighteen on January 8, 2001. The custody of Andreas, while contested early in these protracted proceedings, is not a direct issue on this appeal.

Both the appellant and the appellee are medical doctors. The appellant is a graduate of the University of Chicago Medical School and is employed as a tenured professor of pediatrics and public health at the Johns Hopkins University. The appellee, born in Norway, was also graduated from the University of Chicago School of Medicine, obtained a Master of Science degree in public health from the University of Rochester, and was employed from 1988 to 1999 as a research associate in the Department of International Health at the Johns Hopkins School of Hygiene and Public Health.

The parties separated in early May 1997. Andreas, who was 14 at the time of the parties' separation, remained with appellee in the marital home until November 1997, when he went to live with appellant in a nearby apartment. He experienced difficulties with his parents' separation and underwent counseling and a brief period of hospitalization. Each of the parties sought custody; an attorney for Andreas was appointed by the court; and the matter was finally resolved with the agreement of all parties three years later, with custody being awarded to the appellant.

The appellee continued to work full time until September 1998 and then began a reduced schedule of 80% until her employment was terminated in September 1999. Prior to 1998 she had taken some periods of unpaid leave of absence,

primarily the three months of November and December 1997 and January 1998. After her separation, she tried unsuccessfully to do some consulting work. Later testimony in the trial on December 21, 2000 established that the appellee had been treated by a psychiatrist since 1996 and that the separation and divorce had a profoundly adverse effect on her mental condition and ability to work. She suffered major depression; anxiety disorder; and obsessive compulsive anxiety disorder which, even though treated with medication and psychotherapy, caused her to stop work and, in the opinion of her psychiatrist, would have prevented her return to work in the next year.

### Pertinent Procedural Background

The appellee had requested alimony, both pendente lite and permanent. A master's pendente lite hearing was held on March 16, 1999, which resulted, on April 20, 1999, in the master's recommendations 1) that the appellee pay child support in the amount of $536 per month to the appellant and 2) that the appellant pay alimony pendente lite in the amount of $1,500 per month to the appellee.[1] Neither party had made any payments to the date of the master's hearing, so the master computed the arrearage owed by appellant at $5,676 accounting from June 1998 to April 1999 and using the above child support and alimony figures.

Exceptions were filed to the master's report by the appellant. A hearing was held by Judge Kane on January 4, 2000. He overruled the exceptions in a written opinion filed on January 14, 2000. On the same day, the court signed the pendente lite order recommended by the master.

The parties on the same date, January 4, 2000, executed an agreement covering child custody, support and visitation, the division of personal property, provisions for the purchase of the marital home by the appellee, creation of a college fund for Andreas, and agreement that the appellant would proceed

---

1. Appellee had continued to pay the mortgage payment of $1,577 per month throughout the separation.

with his divorce action based on two years' separation. The agreement further provided that the appellee would not be prohibited from seeking alimony, counsel fees, and a marital judgment award based on a division of assets.

The judgment of divorce, signed on October 11, 2000, granted the appellant an absolute divorce, awarding him care and custody of Andreas; continuing the respective child support and alimony pendente lite awards; determining the respective arrearages of the parties; and retaining jurisdiction in the court "for determination of alimony, marital property, attorney's fees and litigation costs, said matters to be heard by the Court within 90 days of the date of this judgment."

The trial of the reserved issues occurred on December 21 and 22, 2000. Between October 12 and December 21 various discovery matters were filed, as well as motions for contempt, all of which were disposed of in Judge Kane's Memorandum Opinion. On January 10, 2001, Judge Kane signed an order on the appellee's motion, consented to by the appellant, extending the time for making the marital property determination to February 9, 2001.

Following the issuance, on February 12, of the court's Opinion and Order, the appellant moved to alter and amend the judgment to permit payment of the monetary award by way of a QDRO. He did not raise any challenge to the fact that the court's Opinion and Order of February 12 came after the ostensible deadline of February 9 placed by Judge Kane on the extension.

## The Memorandum Opinion and Order
## Of February 12, 2001

Judge Kane's Memorandum Opinion and Order of February 12, 2001, resolved the four areas of remaining contention. On the subject of alimony, Judge Kane rejected the appellee's request for indefinite alimony and ordered the appellant to pay rehabilitative alimony of $2,500 a month for a period of one year.

With respect to the monetary award, Judge Kane found that the appellant's share of the marital property had a value of $714,213 and the appellee's share had a value of $331,407. He granted the appellee a monetary award of $191,403, representing one-half of the disparity between the two shares.

The appellee had requested various findings of contempt on the part of the appellant. Judge Kane, in effect, upheld four of the appellee's claims in that regard and rejected two others. He essentially resolved the contempt issues by adjusting the equities and, in significant measure, by assessing attorney's fees and costs against the appellant.

With respect to attorney's fees and costs, the appellee had initially requested $38,112.50 in attorney's fees and costs of $8,222.12. The costs included an expert witness fee of $2,650 and one-half of the fee of the attorney for Andreas. Judge Kane found that the appellee had been justified 1) in pursuing her alimony claim, 2) in litigating the child support and custody proceedings, 3) in enforcing the terms of the parties' agreement, and 4) in pursuing discovery violations and related contempt claims. He ordered the appellant to pay to the appellee $45,164.12 for attorney's fees and costs.

## The Monetary Award

### A. The Timeliness of the Marital Property Identification

The appellant challenges the monetary award in two regards. His primary contention is that the court lost its authority to make a monetary award because it failed to act within the statutorily prescribed time periods to determine what was marital property.

Although it is not ultimately critical to his contention, the appellant falls into the common error of conflating 1) the designation of marital property with 2) the granting of a monetary award in terms of what is subject to statutorily prescribed time limits. They are separate, albeit related, steps in a three-step process. *Doser v. Doser,* 106 Md.App. 329, 349–50, 664 A.2d 453 (1995). In Step One, the judge "shall determine which property is marital property." That

requirement is spelled out in Maryland Code, Family Law Article, § 8–203. In Step Two, the judge then "shall determine the value of all marital property." That requirement is spelled out in § 8–204. In Step Three, the judge "may ... grant a monetary award." That provision is § 8–205.

Although the three steps are inextricably intertwined, the time limits that concern us literally apply only to Step One. Many attorneys, however, fail to note the fine distinction. Fader and Gilbert, *Maryland Family Law* (3d ed.2000), points out, in this regard, at 15–23 and 15–24:

> Time limits are set by statute within which action must be taken by the one seeking a monetary award to perfect the right to obtain that award. *While most attorneys think in terms of the statute requiring the trial court to determine the monetary award within a limited period of time, the limitations within the statute are applicable to Step One* (Determining/Identifying the Marital Property).

(Emphasis supplied).

Although, as in the present case, all three steps are almost always telescoped into a single phenomenon, they are not literally the same. *Fader,* at 15–26 and 15–27, highlights both the narrow coverage of the time limitation and its intriguing ramifications.

> It is important to note again that *it is [to] the determination as to which property is marital property, that the 90–day time limit on presentation is applicable—not to the granting of a monetary award.* This distinction may be important, particularly in cases of pension evaluation, where out-of-state uncooperative pension trustees may delay furnishing information necessary to make the monetary award possible within 90 days of divorce under § 8–205. The trial judge may, however, be able to decide whether and to what extent a pension is marital property within the 90–day period. No case decision has yet specifically decided this point. But, the statute has to mean what it says as it says what it means.

> ... if there is a dispute as to whether certain property is marital property,
>
> ... the court shall determine which property is marital property:
>
> > (1) when the court grants an annulment or an absolute divorce;
> >
> > (2) within 90 days after the court grants an annulment or divorce,
>
> *it does not say must value within that time.* Does it? *it does not say "must" grant a monetary award within that time.* Does it?
>
> We will see. Practically, in almost every case, all three steps are done at the same time. But .... there will be. that case sometime .... and ...

(Emphasis supplied).

Turning attention to Step One, without the satisfaction of which Step Three could never proceed, § 8–203 provides that, if there is a dispute as to whether certain property is marital property, the court shall make that determination (1) when the court grants an absolute divorce, (2) within 90 days after grant of an absolute divorce if the power to do so is reserved in the decree, or (3) beyond the 90 day period if the court extends the time for making the determination during the 90 day period and the parties consent to the extension.

*Heinlein v. Stefan*, 134 Md.App. 356, 366–67, 759 A.2d 1180 (2000), thoroughly examined the requirements for valid action within each of those periods. With respect to the first, it observed:

> Subsection (a) confers on the court the authority to "determine which property is marital property." There are then set out three times at which or time periods within which the court may make such a determination. Subsection (a)(1) provides that the court may make the marital property determination *at the time* the court "grants an annulment or an absolute divorce." There are no conditions or limitations placed upon the judge's authority to make the determi-

nation at that time. It is simply inherent in the court's authority to decide the divorce case.

134 Md.App. at 366, 759 A.2d 1180 (emphasis in original). The first of the three time periods was clearly not utilized in this case. The decree of absolute divorce was issued on October 12, 2000. The marital property determination was not made at that time.

With respect to the second time period, *Heinlein v. Stefan* continues:

Subsection (a)(2) then deals with the period of *the first 90 days following* the court's granting of an absolute divorce. It provides that the court may still make a determination as to which property is marital property. It places on that authority, however, the precondition that the court shall have expressly reserved in the annulment or divorce decree itself the power to make such a delayed determination. Without such a reservation, the court may not act. If the court has made such a reservation, however, its authority to act within the initial 90 day period is unilateral. No consent is required of either party to the divorce action.

134 Md.App. at 366, 759 A.2d 1180.

No ultimate action was taken during that second time period, but all necessary conditions were satisfied to keep the court's jurisdiction viable into and through the period. In the initial divorce decree, the court had expressly reserved the power to make a delayed determination as to which property was marital. It was, indeed, within that initial 90–day period that the court, on December 21 and 22, 2000, conducted a hearing with respect to the marital property. It did not, however, make its ultimate determination within the period. A second extension into the third time period loomed.

■ It is the third of the time periods that concerns us. With respect to it, *Heinlein v. Stefan* concludes:

Subsection (a)(3) then deals with the third and final time period, the time *"after the 90–day period."* That period stretches endlessly from the 91st day to an open-ended future. The court's authority to act beyond the 90th day,

however, is cabined in by three pre-conditions.... Subsection (a)(3) gives the court the authority to "determine which property is marital property":

(3) after the 90–day period if:

(i) the court expressly reserves in the annulment or divorce decree the power to make the determination;

(ii) during the 90–day period, the court extends the time for making the determination; and

(iii) the parties consent to the extension.

134 Md.App. at 367, 759 A.2d 1180 (emphasis in original).

On January 9, 2001 (the 89th day), the appellee requested the further extension. Following a conference call among all concerned parties, Judge Kane on January 10 granted the further extension. Several days prior to that, however, counsel for the appellee had written to counsel for the appellant about the apparent necessity of requesting the further extension. The reply from appellant's counsel not only did not oppose such an extension but suggested that a further extension was not even necessary. The position of appellant's counsel was that Judge Kane had the continuing authority to act, without any time limitation.

Dear Larry:

I received your Sunday afternoon letter about the reservation of the marital property issue.

*Kindly provide me with any authority stating that* not only does the hearing have to occur within the 90 days, but additionally, *the Court must rule within the 90 days. I do not know of any such case, and hence, do not know of any need to bother the Court on such an issue.*

*I think we should both wait for the Court's opinion, patiently.* He will get to us when he can. Remember, you are the one who forced him to have to read a whole transcript of a deposition in addition to all of the trial testimony. I think

you are going to have to find another case to work on until the Court is ready to give us his ruling on this one.

(Emphasis supplied).

In the conference call of January 9 among Judge Kane, counsel for the appellee, and counsel for the appellant, counsel for the appellant agreed to the extension. A confirmatory letter from appellant's counsel to Judge Kane on that same day expressly spoke for the appellant himself as agreeing to the extension.

Dear Judge Kane:

Based on our conference call of a few moments ago, *I spoke to my client. He is willing to agree to an extension of time* for the Court to rule on the outstanding issues.

(Emphasis supplied).

Thus, all three of the statutorily prescribed conditions, spelled out in § 8–203(a)(3), for conferring continuing jurisdiction on the trial court were fully satisfied. The Family Law Article requires nothing more.

### B. The February 9 Factor

In his letter to Judge Kane on January 9, counsel for the appellant, in his first paragraph, agreed to the further extension of time. In his second paragraph, however, he went on to make the additional request that the extension not be for longer than "30 additional days." This was not a condition placed on the agreement to the extension. It was an *ex parte* request to the court.

*We would request that the Court not extend the time more than 30 additional days.* As the Court knows, my client is still paying *pendente lite* alimony, which will continue until the Court makes its ruling. That is why *we would ask for an expeditious conclusion to these proceedings.*

(Emphasis supplied).

At that point, all conditions, save only the actual granting of the extension by Judge Kane, had been satisfied for the second extension into the third and final time period. The

"power to make the determination" had been "expressly re-serve[d] in the ... divorce decree." Both "parties [had] consent[ed] to the extension." Judge Kane then "during the 90–day period" (on January 10) "extend[ed] the time for making the determination."

■ Judge Kane had it within his unfettered discretion at that point not to place any time limit on that final extension. As *Heinlein v. Stefan,* 134 Md.App. at 367, 759 A.2d 1180, pointed out, § 8–203 contemplates only a "third and final time period" with no necessary further limitation.

Subsection (a)(3) then deals with the third and final time period, the time "after the 90–day period." *That period stretches endlessly from the 91st day to an open-ended future.*

(Emphasis supplied).

Although subsection (a)(3) did not require, under the cir-cumstance of this case (the unqualified consent of the parties), Judge Kane to place any time limit on the final extension, neither did it preclude him from doing so. As a practical matter, when the consent of the parties to the extension is not conditioned by the setting of a deadline, a trial judge might be ill-advised gratuitously to impose a deadline on himself. If unforeseen circumstances should prevent a judge from meet-ing the self-imposed deadline, no further extension would be possible. Even with the consent of the parties, Judge Kane could not on February 8, for instance, have granted another extension to March 9. Or on March 8, another extension to April 9. Any such additional extensions would be in violation of § 8–203(a)(3)(ii), which requires the court to grant the exten-sion "during the 90–day period." [2]

2. In *Williams v. Williams,* 71 Md.App. 22, 523 A.2d 1025 (1987), there had been, coincidentally, a series of such further extensions. The opinion went off to decide the case on other grounds, however, and there was no apparent awareness on our part, let alone a considered analysis, of the phenomenon of incremental extensions. Clearly, we were not approving the phenomenon.

In this case, however, Judge Kane, though not required to do so, sought to accommodate the appellant's request for expedition and his extension order of January 10 reflected that accommodation.

Upon motion of A. Elisabeth Sommerfelt, Defendant/Counter–Plaintiff, the Plaintiff/Counter–Plaintiff, Mark C. Steinhoff, having consented thereto, it is this *10th* day of *January*, 2000[Sic], by the Circuit Court for Howard County, Maryland, ORDERED, that *the time for making a determination of marital property* pursuant to Family Law Article § 8–203 *is extended to February 9, 2001.*

(Emphasis supplied).

What is now the central issue of this appeal swirls about the fact that, as of the close of business on Friday, February 9, 2001, no resolution of the marital property issue was forthcoming from the court. The 23–page Memorandum Opinion of the court was signed by the judge on Monday, February 12, one working day and three calendar days after the self-imposed deadline of February· 9. Copies were mailed to counsel on February 12 and the clerk docketed the Memorandum Opinion on February 14. In a subsequent pleading, the appellant refers to "the Memorandum Opinion and Order of the Court dated February 12, 2001," although he now consistently refers to the order of "February 14," presumably for the rhetorical benefit of stretching the violation for another two days. A violation is a violation, however, whether for one working day or three, whether for three calendar days or five.

It is the appellant's position that the failure of the court to abide by its self-imposed February 9 deadline divested the court of its jurisdiction over the marital property and would render any post-February 9 judicial effort to resolve the marital property issue a nullity.

## C. Non–Preservation of the Issue

■ Strangely, the appellant raised no objection to the timeliness of the Memorandum Opinion at the time it was issued. On February 23, he filed a Motion to Alter or Amend

Judgment. Its eleven numbered paragraphs made no mention of the post-February 9 filing. Following a response to the motion by the appellee, the appellant, on March 20, filed a five-page Reply to the Defendant's Response and again made no mention of the timeliness issue. The issue was raised for the first time on this appeal. That does not preserve it for appellate review. *Davis v. Davis,* 335 Md. 699, 718–19, 646 A.2d 365 (1994) (" § 8–203(a) was violated. Unfortunately for Mr. Davis, his failure to raise the violation of § 8–203(a) at the trial court level is fatal to his claim of error.").

### D. The Sanction For A Violation by the Judge

In this case, however, we choose to overlook the nonpreservation of the contention. We do so because it lends us the opportunity to explore the appropriate sanction, if any, when the failure to meet a § 8–203 deadline is the fault of the trial judge.

The appellant's contention that the court's failure to meet the February 9 deadline divested the court of jurisdiction and rendered the court's ultimate determination a nullity has no merit. In *Brodak v. Brodak,* 294 Md. 10, 447 A.2d 847 (1982), the trial judge, facing a 90–day deadline, failed to issue his decision designating marital property until the 91st day. The husband argued that the trial court had thereby lost all jurisdiction to make a monetary award. The Court of Appeals disagreed. It rejected "the concept that because of the delay 'the court lost jurisdiction and [for that reason] any determinations thereafter concerning the [marital property] were nugatory.'" 294 Md. at 14, 447 A.2d 847.

The *Brodak* analysis then introduced the concept of fault for failure to meet a deadline and the bearing that the placement of the fault would have on the appropriateness of imposing a sanction.

The position that the husband would have us take would be to impose a sanction on the parties for the failure of the arbiter of the controversy, in this instance the circuit court, to act within the period prescribed by statute. Since it is

the husband, not the wife, who is dissatisfied with the chancellor's award, *the practical effect were we to adopt the husband's position would be to place the sanction for the chancellor's failure to act within the specified time upon the prevailing party, the wife. We think that result would be wrong .... [W]e decline to impose such a sanction here.*

294 Md. at 25, 447 A.2d 847 (emphasis supplied).

In *Davis v. Davis,* 335 Md. 699, 719, 646 A.2d 365 (1994), the Court of Appeals characterized its earlier decision in *Brodak.*

*We have, however, previously considered and soundly rejected the contention that the ninety-day time limitation is jurisdictional.* In *Brodak v. Brodak,* we were asked to determine whether a trial court's failure to comply with Maryland Code § 3–6A–05(a)(1) of the Courts and Judicial Proceedings Article, the predecessor to the present § 8–203(a), divested the court of the power to make a marital property determination. There, we unequivocally held that *"the court was not deprived of jurisdiction by its failure to act within the ninety-day period."*

(Emphasis supplied).

In *Zorich v. Zorich,* 63 Md.App. 710, 493 A.2d 1096 (1985), the decision of this Court turned on our application of *Brodak's* criterion of fault. In *Zorich,* the 90–day deadline for making a monetary award fell on June 20. Within the 90–day period, a hearing was held on May 28 and the judge made a tentative ruling from the bench. The court delegated to the appellee, however, the task of drafting the final decree and submitting it to the court for signature. The supplemental decree, incorporating the monetary award, was not filed until July 12, 22 days after the expiration of the 90–day period.

The appellant's position in that case, just as is the appellant's position here, was that the supplemental decree was a nullity.

Pointing out that orders and decrees of an equity court must be in writing and signed by the equity judge, and that § 3–6A–05(a)(1) [the predecessor to § 8–203] is mandatory,

*appellant argues that the failure of the trial judge to sign and file the supplemental decree within 90 days rendered the supplemental decree a nullity since the court lost jurisdiction to act.* Thus, appellant contends that when counsel is directed to draft a decree and that decree is not filed within the 90 day period, counsel is at fault and the court, although it has made the "determination" orally, loses its power to execute and file a binding and effective decree incorporating that determination.

63 Md.App. at 713–14, 493 A.2d 1096 (emphasis supplied) (citations omitted).

Writing for this Court, Judge Robert M. Bell (now Chief Judge of the Court of Appeals) referred to that contention as "this extraordinary proposition." *Id.* We analyzed the *Brodak* opinion and its recognition of fault as the pivotal criterion. Judge Bell concluded:

Thus, *it is neither the lapse of time, nor the mandatory nature of § 3–6A–05(a)(1) which is controlling;* rather, *it is the responsibility for the delay. The responsibility for making the determination* required by the statute *and for filing the decree* embodying that determination *rests with the trial judge.* That responsibility is not, and cannot be, shifted to a party by a direction from the judge that that party draft or prepare the decree. We will not, under these facts, shift the burden of the court's failure to act to the prevailing party.

63 Md.App. at 715–16, 493 A.2d 1096 (emphasis supplied).

In *Ticer v. Ticer*, 63 Md.App. 729, 493 A.2d 1105 (1985), by contrast, we held that the "imposition of the sanction that prohibits the court from acting [was] proper." 63 Md.App. at 736, 493 A.2d 1105. In that case, the 90 day deadline of December 26, 1979 was missed by over two years. Significantly, the appellant had failed within the 90 day period even to move for a hearing. The appellant was, therefore, at fault.

In *Williams v. Williams*, 71 Md.App. 22, 523 A.2d 1025 (1987), the appellant, seeking the imposition of the sanction for a missed deadline, relied heavily on *Ticer*. Judge Bell, again

writing for this Court, cautioned against an overly broad reading of *Ticer.*

> First, we note that the fault test of *Brodak* remains viable. *Ticer* specifically recognizes that this is so. But even if it had not, *Ticer* could not overrule *Brodak.*

71 Md.App. at 33, 523 A.2d 1025.

In *Williams,* it was assumed, without discussion, that the trial judge was facing a deadline of March 25. The judge's ultimate decision was not rendered until June 25. The key rationale for the *Williams* decision was that the fault, if any, was only that of the judge and not that of the parties. Judge Bell's opinion contrasted *Brodak* and *Zorich,* on the one hand, from *Ticer,* on the other.

> In this case, as in *Brodak* and *Zorich,* all of the evidence necessary for the court to designate marital property had been provided to the court within the 90 day period. It was only the court's order that was entered after the 90th day. In *Ticer,* on the other hand, the evidence necessary to permit the court timely to make the designation of marital property was not provided the court until after the expiration of the statutory period. Since all three cases recognize that failure to act within the statutory period did not affect the jurisdiction of the court, it is patent that the procedural posture of each case dictated the result. Thus, *we glean from the cases that the trial judge ordinarily is at fault when, having been provided with all of the evidence necessary timely to determine marital property, he or she delays in doing so until after the statutory period has passed;* the parties are ordinarily at fault when they fail to provide the necessary information within the statutory period. This explains why the allocation of fault in *Ticer* was different than it was in *Brodak* and *Zorich.*

71 Md.App. at 33–34, 523 A.2d 1025 (emphasis supplied).

In the last analysis, there was no occasion to invalidate the judge's marital property determination in *Williams* even if it had been filed after the deadline.

The case *sub judice* is more akin to *Brodak* and *Zorich* than to *Ticer*. Prior to the beginning of the statutory period and continuing until the trial judge had filed his Findings of Facts and Conclusions of Law, *the parties had presented to the trial judge all of the evidence necessary to permit him to designate marital property* and to make disposition with respect thereto, including determining if alimony should be awarded. Beyond consenting to an extension of time, and urging the court to make a decision, *the parties here had no further role to play in the designation of marital property* or in the decision pertaining to its disposition. Therefore, as in *Brodak* and *Zorich, the fault was that of the trial judge and not that of the parties* or either of them.

71 Md.App. at 34, 523 A.2d 1025 (emphasis supplied).

 In the case now before us, the parties had been present at a hearing dealing with all reserved issues on December 21 and December 22, 2000, and had presented all the evidence they had to offer. Any failure to comply with the February 9 deadline was the fault of the court alone and not of the parties. The court was not, therefore, divested of its authority to act.

### E. The Absence of a Qualified Domestic Relations Order (QDRO)

The second attack that the appellant mounts on the monetary award is that "the trial court erred by refusing to grant a Qualified Domestic Relations Order (QDRO) to the appellee as part of her monetary award." At the outset, we note that Judge Kane did not "refuse" to do anything in this regard because Judge Kane was never timely asked to do anything in this regard.

### 1. Non–Preservation

 Although a purely cursory glance at the contention strongly suggests to us that it has no merit, *Deering v. Deering,* 292 Md. 115, 131–32, 437 A.2d 883 (1981), we do not find it necessary to address the merits. This contention has

not been preserved for appellate review. The appellant's brief is treacherously vague on this point. He cites to us only *Freedenburg v. Freedenburg*, 123 Md.App. 729, 750–51, 720 A.2d 948 (1998), a case in which we remanded on other grounds and then devoted a single paragraph to the subject of a QDRO. The appellant now argues at length about the appropriateness of a QDRO in this case. The appellant is conveniently silent, however, as to whether he ever alluded to the subject to Judge Kane before Judge Kane finally disposed of this case on February 12, 2001.

We have scoured the two-volume, 1512–page record extract, including significantly the transcript of the hearing of December 21–22, 2000, and can detect no trace of the subject's ever being raised. Prior to filing his final Opinion and Order, Judge Kane was never asked to consider the subject. There is before us, therefore, nothing preserved for appellate review.

## 2. A Motion to Alter or Amend As a Stab at Belated Preservation

■ It was only after Judge Kane's Opinion and Order was filed on February 14, 2001, that the appellant first raised the subject of a QDRO in his Motion to Alter or Amend the Judgment Entered on February 14, 2001. The Motion to Alter or Amend was summarily denied. Even now, the appellant does not tell us whether he is trying to appeal from Judge Kane's order of February 14, 2001, or from the denial of his Motion to Alter or Amend per se.

■ There are significant differences between the two arguable appeals. They are diametrically different in terms of the preservation of the contention. They are also vastly different in terms of the respective standards of appellate review. Involved are two absolutely distinct procedural phenomena that do not casually coalesce into a single warm and fuzzy contention. The appellant may not exploit an appeal from a post-trial procedure as a device to outflank the non-preservation bar to an appeal from a trial procedure. One may not preserve an issue *nunc pro tunc*.

The appeal as to this contention, whatever it is, does not turn square corners. If, indeed, it is the February 12 monetary award itself that is being appealed from, we will not allow the appellant's reference to raising the issue in a post-trial motion to serve as a smokescreen obscuring the earlier and fatal non-preservation.

### 3. A Motion to Alter or Amend As an Independent Contention

 With respect to the denial of a Motion to Alter or Amend, if that should be what is before us, the discretion of the trial judge is more than broad; it is virtually without limit. What is, in effect, a post-trial motion to reconsider is not a time machine in which to travel back to a recently concluded trial in order to try the case better with hindsight. The trial judge has boundless discretion not to indulge this all-too-natural desire to raise issues after the fact that could have been raised earlier but were not or to make objections after the fact that could have been earlier but were not. Losers do not enjoy *carte blanche*, through post-trial motions, to replay the game as a matter of right.

 Even assuming, *arguendo*, the appealability of the denial of a post-trial motion, the appellant would carry a far heavier appellate burden on that issue than he would carry in challenging the denial of a more timely motion for relief made during the course of trial. Appellate consideration of a denial of a motion to reconsider, or some similar post-trial revisiting of already decided issues, does not subsume the merits of a timely motion made during the trial.

That a party, *arguendo*, should have prevailed on the merits at trial by no means implies that he should similarly prevail on a post-trial motion to reconsider the merits. A decision on the merits, for instance, might be clearly right or wrong. A decision not to revisit the merits is broadly discretionary. The appellant's burden in the latter case is overlaid with an additional layer of persuasion. Above and beyond arguing the intrinsic merits of an issue, he must also make a strong case

for why a judge, having once decided the merits, should in his broad discretion deign to revisit them.

In this case, after issuing a thoroughly detailed 21 page Opinion and Order, with all of its provisions intricately intertwined, a granting of the appellant's Motion would have sent the entire disposition of this case back to square one. If it is the denial of the Motion to Alter or Amend that is before us (and the appellant does not suggest that it is), there was no distant whisper, no hint of an echo, no glimmer or murmur, of any abuse of discretion on the part of Judge Kane.

## F. A Final Flank Attack

In a passing nine lines, the appellant urges that "the trial court erred ... with regard to the monetary award" by ordering the appellant to pay to the appellee $25,837. The contention would have no merit even if properly located. The short answer to this subcontention of the larger attack on the monetary award, however, is that this order clearly had nothing to do with the monetary award.

Judge Kane's Memorandum Opinion recited in pertinent part:

> "*Marital property*" does not include property, "*excluded by valid agreement.*" Family Law § 8–201(e)(3)(iii). Paragraph 5 of the agreement of the parties dated January 4, 2000, notes that the parties have disclosed to one another the existence of nine jointly held Vanguard Fund accounts. The Agreement states that "the parties shall immediately liquidate and divide equally said funds." It further states, as follows:
>
>> "Additionally, the following 2 Vanguard accounts in Husband's name contain funds that are mixed non-marital and marital property. To the extent such funds are marital, as indicated below, 50% of said marital portion will immediately be distributed to Wife."
>
> As hereinafter discussed with reference to the issue of contempt, the evidence discloses that the value of one-half of the marital portion of the two Vanguard accounts is twenty-

five thousand eight hundred thirty-seven dollars ($25,-837.00). *Since by agreement the parties have provided for its distribution, the funds are not marital property.* The failure of the Husband to "immediately" distribute her portion is hereinafter addressed in the section pertaining to contempt.

(Emphasis supplied).

The appellant's subcontention in this regard has neither merit nor any bearing on the monetary award.

### Attorney's Fees and Costs

The appellant contends that the award to the appellee of attorney's fees and costs in the amount of $45,164.12 is flawed because (1) the court did not specify the amount which is attributable under each of the five statutes or rules he believes could apply,[3] (2) the court failed to assess the financial need of the appellee before making the award and (3) the court failed to award the appellant reimbursement for his attorney's fees in defending the custody claim of the appellee, instead awarding her fees for what he claims is her baseless custody claim. None of his arguments has merit.

On the first day of trial, during opening statements, counsel for the appellee submitted his petition for counsel fees and costs with attached time sheets and supporting documentation of costs. After counsel conferred off the record, counsel for the appellee stated:

"Counsel brought to my attention that we had agreed that both sides would be submitting a request for counsel fees and costs and let the court decide what is appropriate."

Counsel for the appellant agreed that that was, indeed, the stipulation of the parties. Both 1) the appellee's petition and

---

**3.** The appellant's references are to (1) § 11–110 Family Law, (2) § 12–103 Family Law, (3) § 8–214 Family Law (which he says does not apply retroactively), (4) Md. Rules 2–432 and 2–433 (discovery violations), and (5) Md. Rule 1–341 (actions filed in bad faith). He omits any reference to provisions for the award of fees and expenses when such is provided for in a separation agreement.

time sheets from 1997 to that date and 2) the appellant's time sheets for the same period were admitted into evidence. The appellee claimed $38,112.50 in counsel fees and $8,222.12 in costs; the appellant claimed $52,647 counsel fees and $1,677.28 costs.[4]

Neither counsel for the appellee nor counsel for the appellant made any allocation of counsel fees or costs by specific categories, such as separation and divorce, custody, child support, alimony, the agreements, division of personal property, or the like. At no time during the trial, or in the motion to alter and amend, did counsel for the appellant seek a separate or discrete sum to cover any of the actions involving child custody or even to object to any such so-called award to the appellee. Such a division in any involved divorce action, where virtually every pleading, hearing or trial deals with at least two or more interrelated subjects, would be difficult if not impossible.

The appellant's agreement to "submit a request for counsel fees and let the court decide", his submission of computerized time sheets without categorization of the subjects covered and without specifying even the time spent on the custody matter, and his failure to object to a similar approach by the appellee constitute a failure to preserve for appellate review the issue of attribution to a separate statutory source each sub-item of attorney's fees and costs.

The standard of review for the award of counsel fees and costs in a domestic case is that of whether the trial judge abused his discretion in making or denying the award. *Lemley v. Lemley,* 109 Md.App. 620, 675 A.2d 596 (1996); *Doser v. Doser,* 106 Md.App. 329, 664 A.2d 453 (1995); *Broseus v. Broseus,* 82 Md.App. 183, 570 A.2d 874 (1990).

---

4. In closing argument, counsel for the appellant repeated simply "on the issue of counsel fees, counsel both agree to submit, give our bills to the court." Counsel for the appellee argued at only slightly more length, pointing out the need for transcripts of hearings and depositions and the effort expended to collect the court ordered alimony pendente lite.

██ The best way to evaluate Judge Kane's award of counsel fees and costs is to examine his very thorough opinion on this matter. After reviewing the monetary breakdown of the appellee's claim, he observed:

The right to recover attorney fees and litigation expenses incurred in pursuing domestic litigation is limited. Section 11–110 of the Family Law Code allows the Court to consider an award of attorney fees, costs and expenses in a proceeding concerning alimony. Section 12–103 allows the Court to award attorney fees, costs and expenses in a proceeding concerning, child support, custody and visitation. Maryland Rule 2–433 provides for an award of expenses, including attorney fees, for discovery violations.

Furthermore, attorney fees and costs incurred in conjunction with an attempt to specifically enforce the provisions of a separation agreement may be recoverable if the agreement contains language providing for same. *Campitelli v. Johnston,* 134 Md.App. 689, 761 A.2d 369; *Lebac v. Lebac,* 109 Md.App. 396, 675 A.2d 131. The January 4, 2000 agreement between the parties contains such a provision. Paragraph 9 provides:

"If either party breaches a provision of this Agreement, or is in default thereof, said party shall be responsible for any reasonable legal fees and expenses incurred by the other party in seeking to enforce this Agreement."

Upon review, the Court finds that the attorneys' fees incurred by the Wife were reasonable and necessary. The work performed was necessary and the hourly rate charged was reasonable. The Court further finds that the transcription costs incurred were necessary and that the expert witness fees associated with the testimony of Dr. Warres were appropriate in the light of the contested nature of the alimony claim. To the extent that the Wife seeks reimbursement of counsel fees paid to Anthony Doyle, Esquire, her request is denied. Each of the parties were directed by court order to pay an equal sum to Mr. Doyle.

The Court further finds that the Wife was justified in prosecuting a claim for alimony and in attempting to enforce

provisions of the parties' separation agreement. The Husband has the financial ability to pay the Wife's attorney's fees and expenses of litigation. Within thirty days from the date hereof, the Husband shall pay the sum of forty-five thousand one hundred sixty-four dollars and twelve cents ($45,164.12) to the Wife for fees and expenses incurred.

Judge Kane's opinion is a model for applying the pre–1999 [5] standards authorizing the award of counsel fees. He considered the financial status and needs of each party and he analyzed the justification for bringing or defending the action. His award of fees and costs was clearly not an abuse of discretion.

Judge Kane had been directly involved in every aspect of this case almost from its inception. He reviewed the master's pendente lite hearing on the appellant's exceptions, issued the pendente lite order, was involved in every action leading up to the final order and opinion, took testimony on the hearing for absolute divorce, issued the decree and then heard the final two day trial. There is no question but that he possessed a thorough knowledge of the case and of the parties, their relative financial positions, the justification for bringing and defending each action, and the work product of the attorneys.

In his Memorandum Opinion, Judge Kane ruled separately that 1) the appellee was awarded counsel fees and costs for the appellant's failure timely to comply with payment of the arrearages on alimony pendente lite; 2) the appellant had failed to produce documents in discovery, but that, since there was no order, he was not in contempt; 3) the appellee was awarded counsel fees and costs for the appellant's failure to attend a deposition; 4) the appellant should reimburse the

---

5. Chapter 391 of the Acts of 1999 now permits the award of counsel fees, in cases filed after October 1, 1999, in cases involving limited and absolute divorce (Title 7, Family Law Article) and property disposition in annulment and divorce (Title 8, Family Law Article) in addition to actions involving alimony and child support and custody. Judge Kane recognized the "pre–1999" limitation by noting that the agreement of January 4, 2000 between the parties authorized an award to carry out all aspects of the agreement.

appellee for a disputed division of Andreas's college fund, but this did not rise to the level of contempt; 5) the appellant was found in contempt for failure to immediately pay 50% of the marital portion of two Vanguard accounts instead of negotiating a lesser amount and was again ordered to pay the full sum with interest from June 22, 2000; and 6) the appellant was found not to have abused his role as custodian for two funds for Kristoffer's and Andreas's college fund.

We review these findings in detail to illustrate the court's involvement in and knowledge of the parties' financial positions. A review of the Memorandum Opinion shows the interrelation between the alimony award, the monetary award, and counsel fees and costs in achieving a fair, just, and balanced division of assets and payments to reflect the statutory factors and financial position of the parties. *Caccamise v. Caccamise*, 130 Md.App. 505, 747 A.2d 221 (2000); *Lemley v. Lemley*, 109 Md.App. 620, 675 A.2d 596 (1996); *Foster v. Foster*, 33 Md.App. 73, 364 A.2d 65 (1976).

The appellant asserts that Judge Kane did not consider his claim for counsel fees. As previously noted, counsel submitted their time sheets and expenses for the court's decision. Judge Kane considered and rejected the appellant's claim by granting the appellee's request. On this subissue as well, there was no abuse of discretion.

### Alimony *Pendente Lite*

Early on in this litigation, Judge Kane ordered the appellant to pay to the appellee alimony *pendente lite* in the amount of $1,500 per month. The appellant now claims that this award was erroneous.

Although the appellant's challenge is not clearly focused, its dominant thrust is that the fact-finding by the master in chancery was clearly erroneous. A hearing was held before a master in chancery on March 16, 1999. The transcript of that hearing covers 211 pages. Both the appellant and the appellee testified at length. Each was cross-examined by the attorney for the other as well as by the independent attorney

for their minor child. Ten exhibits were submitted, six by one side and four by the other. The master heard closing argument from each of the three attorneys.

The master's findings of fact were fully supported by evidence developed in the course of the hearing. Although the appellant filed fifteen exceptions to that part of the master's Report and Recommendations dealing with alimony *pendente lite*, not one of them points to a finding of first-level fact that was allegedly clearly erroneous. The appellant's attacks, in the course of those fifteen exceptions, are all on the master's recommendation and not on the master's findings of specific first-level facts.

In ruling on the appellant's exceptions, following a hearing on January 4, 2000, Judge Kane, in his Memorandum Opinion of January 14, indicated that he had reviewed the record and that he adopted the master's fact-finding on the issue of alimony *pendente lite* as "supported by substantial evidence in the record."

In the Report and Recommendation, the Master made the following findings of fact:

"The parties married 10/21/72; separated 5/97. Initially, wife had custody of the child; husband took custody of the child against the wife's wishes. He is now quite alienated from his mother since going to live with his father.... Wife is living in the family home and has been paying the mortgage of $1,577.00/month. No child support has been paid by (Defendant), nor alimony to the (Plaintiff).... Wife has health problems which prevent her from working full-time. The parties separated as a result of husband's domestic violence against the wife, which was witnessed by the child."

The Master's fact-finding concerning the respective incomes of the parties; the health of the "Wife" and its effect upon her earnings, and the financial needs of the Defendant are supported by the record. *The Court adopts the Master's fact-finding concerning the issue of alimony as its*

*own, since the Master's fact-finding is supported by substantial evidence in the record.*

. . . .

... The Master determined the Plaintiff's gross monthly income to be $9,013.00, and the Defendant's to be $4,420.00. . . .

(Emphasis supplied).

 Neither the finding of first-level facts by the master nor the adoption of that fact-finding by Judge Kane was in error.

The master recommended alimony *pendente lite* in the amount of $1,500 per month. With respect to the master's recommendation in that regard, in contrast to the master's fact-finding, Judge Kane was not deferential. He followed the teaching of *Domingues v. Johnson,* 323 Md. 486, 593 A.2d 1133 (1991), and made his own independent judgment with respect to alimony *pendente lite.*

In evaluating the issues raised by these exceptions, this Court is persuaded to follow the analysis of the Court of Appeals in *Domingues v. Johnson,* 323 Md. 486, 593 A.2d 1133, wherein the Court discussed the proper function of *the Chancellor* vis-a-vis a report and recommendation of a domestic relations master. The Court noted that the Chancellor is not merely to accept recommendations of the master upon finding that these recommendations were not clearly erroneous, but *must* instead *subject the master's fact-finding to the clearly erroneous test and then exercise his independent judgment. Consideration may be given to the recommendations of the master, but in final analysis, the decision must be made by the Chancellor.* The exceptions are hereinafter addressed.

A. *Alimony.*

The Plaintiff contends that the Master erred in recommending pendente lite alimony because there was no need for same. He argues that the Wife is self-supporting and that pendente lite alimony is not necessary.

Maryland Family Law Code, Annotated § 11–102 provides that "in a proceeding for divorce ... the court may award alimony pendente lite to either party." Alimony pendente lite is defined as "an allowance made pending a suit for divorce or separate maintenance, including a reasonable allowance for preparation of the suit as well as for support." *Maynard v. Maynard*, 42 Md.App. 47, 49, 399 A.2d 900. Its purpose is to maintain the status quo of the parties pending the final resolution of the divorce proceedings. *Speropulos v. Speropulos*, 97 Md.App. 613, 631 A.2d 514. In general, it is based primarily on consideration of reasonable needs of the recipient spouse, balanced against the other spouse's ability to pay. *Maynard*, 42 Md.App. at 51, 399 A.2d 900.

. . . .

*... In the exercise of its independent judgment, this Court finds that the Plaintiff has the financial ability to pay alimony in the amount of $1,500.00 per month.*

(Emphasis supplied).

The appellant takes several other unrelated pot-shots at the award of alimony *pendente lite*. In contending that Judge Kane failed to "identify and state how [he] resolved each and every challenge to the Master's Report and Recommendation," the appellant seems to acknowledge that Judge Kane did not run afoul of the teaching of this Court in *Kierein v. Kierein*, 115 Md.App. 448, 693 A.2d 1157 (1997). Arguing that the "test" of *Kierein* "is so vague and open-ended that it allows this Court to engage in an analysis" that provides "no guidance," the appellant invites us to repudiate our *Kierein* opinion. Without further comment, we decline to do so.

The appellant finally argues that alimony *pendente lite*, as a matter of law, is not permitted unless there is a showing of need of a sort that was not shown in that case. He cites *Lemley v. Lemley*, 102 Md.App. 266, 299–300, 649 A.2d 1119 (1994), as authority for the proposition that an award of alimony *pendente lite* cannot be made unless the recipient is not self-supporting. That is a flat misstatement of the law.

*Lemley* dealt solely with rehabilitative alimony under § 11–101 and not with alimony *pendente lite* under § 11–102.

With respect to the appellee's need or lack of need for alimony *pendente lite,* moreover, the appellant makes another argument of highly dubious propriety. He argues that "the Appellee had a sizable income, had $331,407.00 in assets in her name, and additional undisclosed interest from additional income and investments." He cites as authority for that assertion the "Joint Statement of Parties Concerning Marital and Non Marital Property" signed by the parties on December 19, 2000. That information was not before the master when she conducted her hearing on March 16, 1999, twenty-one months earlier, nor was it before Judge Kane when he made the award of alimony *pendente lite* on January 14, 2000, eleven months earlier. Self-evidently, there was no error in failing to consider evidence that was not yet in existence. We hope that the anachronistic placement of this subsequent development into the context of the alimony *pendente lite* adjudication was nothing more than an act of inadvertent carelessness.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**