945 A.2d 656

**Christine R. BURDEN**

v.

**Michael L. BURDEN.**

**No. 0077, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

April 3, 2008.

James L. Wiggins, Baltimore, for Appellant.

Roanne Handler (Schlachman, Belsky & Weiner, PA on the brief), Baltimore, for Appellee.

Panel: SALMON, LAWRENCE F. RODOWSKY (retired, specially assigned), JOSEPH F. MURPHY, JR.,* (specially assigned), JJ.

---

* Joseph F. Murphy, Jr., now serving on the Court of Appeals, participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

LAWRENCE F. RODOWSKY, Judge, (retired, specially assigned).

Christine R. Burden (Christine) appeals from a decree entered by the Circuit Court for Baltimore County in a divorce case that was filed in April 2006. She is aggrieved by the exclusion from the court's child support order of one of her sons, who is the stepson of the appellee, Michael L. Burden (Michael). Christine contends that Michael is precluded from denying paternity because he voluntarily acknowledged paternity on the child's South Dakota birth certificate. Michael has not filed a brief or otherwise appeared in this appeal.

The child is Malachi Antoine Viccarrio (Malachi) who was born to Christine, then unmarried, on July 23, 1995, in Sioux Falls, South Dakota. His original birth certificate was issued using Christine's family name, Handy, as the child's surname. Christine and Michael first met sometime after Malachi was born. The parties were married on April 22, 2000, in South Dakota. They separated in May 2003. After the parties separated, Christine moved to Baltimore. In August of 2003, in connection with his employment as an assistant basketball coach, Michael moved to Florida. Currently, he coaches at the University of Maine. While in Florida, Michael was the object of child support proceedings. Michael testified that a child support order in Florida was entered for both Malachi and his half-brother, Michael, the child of Christine and Michael, who was born on December 6, 1999.[1]

The uncontradicted evidence is that, prior to the parties' separation, Michael treated Malachi as if the latter were the former's own child. Michael supported Malachi, who referred to Michael as his father. Michael's family accepted Malachi as one of the grandchildren or nephews.

---

1. In the circuit court, Christine also referred to a Florida support order, and her counsel suggested in argument that it possibly constituted res judicata on the issue of Malachi's paternity. Appellant, however, did not introduce the Florida order in evidence and presented no other oral or written evidence concerning that order's provisions. She does not advance a res judicata argument on this appeal.

On July 5, 2000, Michael had filed a paternity affidavit with the Department of Health in Pierre, South Dakota, in which he acknowledged, with Christine's signed consent, that he was "the natural father" of Malachi. In that affidavit he furnished personal information which was "to be entered on the certificate o f birth relative to the natural father." Michael also signed the acknowledgment set forth below:

"I acknowledge that I voluntarily sign this Paternity Affidavit. I further acknowledge that all rights, responsibilities, alternatives and legal consequences associated with signing this affidavit have been fully explained to me, orally and/or in writing, and I fully understand the same. I also understand that an affidavit of paternity signed by both parties creates a presumption of paternity and allows for the establishment of a child support obligation without further legal proceedings to establish paternity. I further understand that either party can seek circuit court recission of this affidavit within 60 days of signing the affidavit, unless an administrative or judicial proceeding has already been commenced regarding the child."

The South Dakota Department of Health issued a certificate of birth for Malachi listing Michael as the father.

Christine testified that Michael wanted to adopt Malachi at the time of the affidavit, but that the couple could not get the biological father to sign a termination of parental rights. Michael described the circumstances leading to the execution of the paternity affidavit as follows:

"I don't know about adoption. We discussed—I signed that because the whole thing was he didn't have my last name. Michael had my last name, and she had it, and we was worrying about that. That's why I signed the form."

In the case before us, the circuit court, in an oral opinion, concluded that it could not include Malachi in the support order because the parties agreed that Michael was not the biological father of Malachi. The court would not give effect to the South Dakota paternity affidavit and birth certificate because it was not a court judgment.

In a post-opinion motion, Christine, for the first time, called the circuit court's attention to 9A South Dakota Codified Laws (SDCL) (1999 rev., 2007 supp.), §§ 25–8–52 and 25–8–59. They read:

"**25–8–52. Rebuttable presumption of paternity—Signed and notarized affidavit.** A signed and notarized affidavit of paternity creates a rebuttable presumption of paternity, admissible as evidence of paternity, and allows the Department of Social Services to proceed to establish a support obligation in accordance with the provisions of §§ 25–7A–5 to 25–7A–8, inclusive, without requiring any further proceedings to establish paternity." [2]

"**25–8–59. Actions contesting rebuttable presumption of paternity.** Any action contesting a rebuttable presumption of paternity as established by §§ 25–8–50 to 25–8–58, inclusive, shall be commenced in circuit court either sixty days after the creation of the presumption of paternity or the date of any administrative or judicial proceedings relating to the child including proceedings to establish a support obligation in accordance with § 25–8–52, whichever occurs earlier, except in cases where there are allegations of fraud, duress, or material mistake of fact. In cases involving allegations of fraud, duress, or material mistake of fact, any action contesting a rebuttable presumption of paternity shall be commenced within three years after the creation of any presumption. The burden of proof shall be upon the moving party and the payment of child support, or any other legal responsibilities of the parties, may not be suspended during the pendency of the proceedings, except upon a showing of good cause by the moving party."

Christine contended that the presumption of paternity, arising from Michael's acknowledgment, was irrebuttable because

---

**2.** SDCL §§ 25–7A–5 to 25–7A–8 establish administrative and judicial procedures for obtaining a court order of support. There is no evidence that a South Dakota court entered an order of support against Michael for Malachi, based on the paternity affidavit, or any other basis.

the time set under § 25–8–59 had passed. The circuit court denied the motion by docket entry.

■ In this Court, Christine presents two questions on the merits:

I. "Whether the Trial Court's finding, by implication, that the Appellee's paternity had not been established under the laws of South Dakota was clearly erroneous?"

II. "Whether the Trial Court erred in failing to give full faith and credit to the acts and records of the State of South Dakota Health Department?"

Noteworthy is that Christine does not argue estoppel.[3]

## Standard of Review

■ In *Steinhoff v. Sommerfelt,* 144 Md.App. 463, 798 A.2d 1195 (2002), this Court held that, where a motion to alter or amend raises an independent contention, its denial is subject to broad discretionary review. *Id.* at 484, 798 A.2d at 1207. The procedural history of the divorce action before us implicates the *Steinhoff* rule. The trial in the instant matter concluded on January 9, 2007, at which time the South Dakota statutes had not been cited or argued. At that time, the court orally ruled from the bench. The docket entry for that proceeding concluded: "Order to be filed." It is within ten days from that oral ruling that Christine filed her motion to alter or amend. By an order entered on February 16, 2007, the court denied that motion, and the notice of appeal was filed on March 19, 2007. The judgment of absolute divorce, however, was not docketed until April 26, 2007.[4] Thus, al-

---

**3.** Under Maryland law, estoppel to deny support requires a showing of the mother's reliance on the defendant's implied or express promise of future support which causes the mother to forego support enforcement against the biological father. *See Markov v. Markov,* 360 Md. 296, 758 A.2d 75 (2000); *Knill v. Knill,* 306 Md. 527, 510 A.2d 546 (1986). Here, Christine did not testify about the biological father. The only evidence came from Michael, who did not even know the biological father's last name.

**4.** Under Maryland Rule 8–602(d), the earlier filed order for appeal is considered to have been filed immediately after the entry of judgment.

though the post-trial motion filed by Christine did not have the effect of deferring the time for noting an appeal, because no judgment had been entered, the motion presented an entirely new ground in an attempt to persuade the court to the contrary of its announced ruling.

In *Steinhoff,* a divorce case, the appellant asserted for the first time, in a motion to alter judgment, that a qualified domestic relations order was required, as part of a monetary award. 144 Md.App. at 482, 798 A.2d at 1206. We said that "[t]he appellant may not exploit an appeal from a post-trial procedure as a device to outflank the non-preservation bar to an appeal from a trial procedure. One may not preserve an issue *nunc pro tunc.*" *Id.* at 483, 798 A.2d at 1206-07.

The preservation requirement is governed by Maryland Rule 8–131, providing that "[o]rdinarily," an appellate court will not decide an unpreserved issue. Reposed in the appellate courts, however, is a discretion nevertheless to decide the issue, exercisable, *inter alia,* when an appellate ruling would be desirable for trial court guidance. Because the problem presented here, and application of the analytical framework required to resolve it, are highly likely to recur, we shall exercise our discretion to consider the appeal.[5]

---

**5.** The result that we reach in this case is *contra*-intuitive under present Maryland law. In Maryland, the legal obligation to support children, absent estoppel, arises out of parenthood, natural or adoptive. For example, in *Walter v. Gunter,* 367 Md. 386, 788 A.2d 609 (2002), a 3 –1– 1–2 decision, the Court of Appeals held that a man who had consented to a paternity judgment, which was later vacated based on genetic evidence obtained pursuant to Maryland Code (1984, 2006 Repl.Vol.), § 5–1038(a)(2)(i)2 of the Family Law Article, was not obliged to pay arrearages. *See also Bledsoe v. Bledsoe,* 294 Md. 183, 192, 448 A.2d 353, 358 (1982) (stating that there is no legal duty to support a stepchild, and holding that the statute authorizing an order for the use, after divorce, of the family home did not apply to a wife whose two children were by a prior marriage); *Commonwealth of Virginia ex rel. Halsey v. Autry,* 293 Md. 53, 68, 441 A.2d 1056, 1064 (1982) (the duty to support a child born out of wedlock, as between a stepfather and a biological father, is on the biological father); *Brown v. Brown,* 287 Md. 273, 284, 412 A.2d 396, 402 (1980) (holding that promise by stepfather in separation agreement to support stepchild was not enforceable by confinement for contempt, because a stepchild is not a "dependent

## Discussion

As will appear *infra*, the two questions presented merge into one issue.

Christine contends that the circuit court erred in failing to give full faith and credit to the records of South Dakota. She submits that, under the law of South Dakota, Michael, by voluntarily acknowledging paternity and by failing timely to seek to disestablish paternity, is now conclusively presumed to be the father of Malachi.

Article IV, § 1 of the Constitution of the United States reads:

> "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."

The relevant federal legislation is the Social Security Act, subchapter IV, "Grants to States for Aid and Services to Needy Families with Children and for Child–Welfare Services," Part D, "Child Support and Establishment of Paternity," 42 U.S.C. § 651 *et seq.*, as revised by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the Federal Act), P.L. 104–193, effective July 1, 1997. These federal statutes are the basis for the South Dakota enactments relied upon by Christine. The Maryland counterparts of the South Dakota statutes are found in Maryland Code (1984, 2006 Repl.Vol.), Subtitle 10, "Paternity Proceedings," Title 5, "Children," of the Family Law Article (FL).

Under 42 U.S.C. § 666(a), each state, in order to qualify for federal funds, must have in effect laws requiring the use of statutorily prescribed procedures to improve the effectiveness of child support enforcement. In addition to genetic testing, these procedures include, under § 666(a)(5)(C) and (D), volun-

---

child" within the exception from the constitutional prohibition against imprisonment for debt).

tary paternity acknowledgment. The relevant provisions read as follows:

**"(5) Procedures concerning paternity establishment**

. . . .

**"(C) Voluntary paternity acknowledgment**

**"(i) Simple civil process**

"Procedures for a simple civil process for voluntarily acknowledging paternity under which the State must provide that, before a mother and a putative father can sign an acknowledgment of paternity, the mother and the putative father must be given notice, orally, or through the use of video or audio equipment, and in writing, of the alternatives to, the legal consequences of, and the rights (including, if 1 parent is a minor, any rights afforded due to minority status) and responsibilities that arise from, signing the acknowledgment.

. . . .

**"(iii) Paternity establishment services**

**"(I) State-offered services**

"Such procedures must require the State agency responsible for maintaining birth records to offer voluntary paternity establishment services.

**"(II) Regulations**

**"(aa) Services offered by hospitals and birth record agencies**

"The Secretary shall prescribe regulations governing voluntary paternity establishment services offered by hospitals and birth record agencies.

**"(bb) Services offered by other entities**

"The Secretary shall prescribe regulations specifying the types of other entities that may offer voluntary paternity establishment services, and governing the provision of such services, which shall include a requirement that such an entity must use the same notice provisions used by, use the same materials used by, provide the personnel providing such services with the same training provided

by, and evaluate the provision of such services in the same manner as the provision of such services is evaluated by, voluntary paternity establishment programs of hospitals and birth record agencies.

#### "(iv) Use of paternity acknowledgment affidavit

"Such procedures must require the State to develop and use an affidavit for the voluntary acknowledgment of paternity which includes the minimum requirements of the affidavit specified by the Secretary under section 652(a)(7) of this title for the voluntary acknowledgment of paternity, *and to give full faith and credit to such an affidavit signed in any other State according to its procedures.* [ (Emphasis added) ].[6]

#### "(D) Status of signed paternity acknowledgment

#### "(i) Inclusion in birth records

"Procedures under which the name of the father shall be included on the record of birth of the child of unmarried parents only if—

"(I) the father and mother have signed a voluntary acknowledgment of paternity; or

---

**6.** The Maryland implementation of the affidavit requirement provides, as to form, as follows:

"(c) *Requirements for completion.*—(1) The completed affidavit of parentage form shall contain:

"(i) in ten point boldface type a statement that the affidavit is a legal document and constitutes a legal finding of paternity;

"(ii) the full name and the place and date of birth of the child;

"(iii) the full name of the attesting father of the child;

"(iv) the full name of the attesting mother of the child;

"(v) the signatures of the father and the mother of the child attesting, under penalty of perjury, that the information provided on the affidavit is true and correct;

"(vi) a statement by the mother consenting to the assertion of paternity and acknowledging that her cosignatory is the only possible father;

"(vii) a statement by the father that he is the natural father of the child;

"(viii) the Social Security numbers provided by each of the parents."

Maryland Code (1999, 2006 Repl.Vol.), FL § 5–1028(c)(1).

"**(II)** a court or an administrative agency of competent jurisdiction has issued an adjudication of paternity.

. . . .

"**(ii) Legal finding of paternity**

"Procedures under which a signed voluntary acknowledgment of paternity *is considered a legal finding of paternity,* subject to the right of any signatory to rescind the acknowledgment within the earlier of—

"**(I)** 60 days; or

"**(II)** the date of an administrative or judicial proceeding relating to the child (including a proceeding to establish a support order) in which the signatory is a party.

"**(iii) Contest**

"Procedures under which, after the 60–day period referred to in clause (ii), a signed voluntary acknowledgment of paternity may be challenged in court only on the basis of fraud, duress, or material mistake of fact, with the burden of proof upon the challenger, and under which the legal responsibilities (including child support obligations) of any signatory arising from the acknowledgment may not be suspended during the challenge, except for good cause shown."

The regulation implementing voluntary paternity establishment programs is 45 C.F.R. § 303.5(g). It applies to such programs at, *inter alia,* "the State birth record agencies." § 303.5(g)(1)(ii). Section 303.5(g)(2)(i) requires that the State's voluntary paternity establishment program "[p]rovide to both the mother and alleged father" certain information, including the responsibilities of acknowledging paternity. § 303.5(g)(2)(i)(C). "[A]lleged father" is not a defined term in §§ 303.1 and 301.1.

This ambiguity has not escaped the attention o f commentators. P. Roberts, *Truth and Consequences: Part I. Disestablishing the Paternity of Non–Marital Children,* 37 Fam. L.Q. 35, 37 (2003), has pointed out that "[a] man could sign a voluntary paternity acknowledgment knowing he was not the child's biological parent, but nonetheless wanting to assume

the responsibilities of parenthood"; and Note, "Voluntary acknowledgments of paternity: Should biology play a role in determining who can be a legal father?," 38 Ind. L.Rev. 479, 489 (2005) ("In its effort to simplify paternity establishment through voluntary acknowledgments, Title IV–D ignored one salient question—whether paternity affidavits are intended only for biological fathers.").

The National Conference of Commissioners on Uniform State Laws has also identified the problem. In the comment to new § 301, "Acknowledgment of Paternity," of the Uniform Parentage Act (2000, rev.2002), the Commissioners observed that the Federal Act "does not explicitly require that a man acknowledging parentage necessarily is asserting his genetic parentage of the child." 9B U.L.A. Supp. at 19 (2002). Thus, "[i]n order to prevent circumvention of adoption laws, § 301 corrects this omission by requiring a sworn assertion of genetic parenthood of the child." *Id.* South Dakota has not adopted the Uniform Parentage Act. *Id.* at 4. Nevertheless, the form of affidavit acknowledging paternity for birth registration purposes in South Dakota includes the acknowledgment by the male that he is the "natural" father of the child.

Thus, the ultimate issue before us is whether Michael, in Maryland, may disestablish, based on the agreed fact that he is not the biological father of Malachi, the natural fatherhood that he voluntarily acknowledged in South Dakota. This raises the question, "Which state's law applies?"

### A. Full Faith and Credit

■ Under the Federal Act, each participating state must "develop and use an affidavit for the voluntary acknowledgment of paternity[.]" 42 U.S.C. § 666(a)(5)(C)(iv). Each participating state must also have in effect laws requiring procedures "to give full faith and credit to such an affidavit[, *i.e.,* a voluntary acknowledgment of paternity,] signed in any other State according to its procedures." *Id.* Under the rule of construction of the immediate reference, "its," in the context of the case before us, refers to the procedures of South Dakota.

Consistent with that reading, the implementing federal regulation requires

"[p]rocedures under which the State must give full faith and credit to a determination of paternity made by any other State, whether established through voluntary acknowledgment *or* through administrative or judicial processes."

45 C.F.R. § 302.70(a)(11) (emphasis added).

The Maryland implementation of this standard for a Title IV–D program is FL § 5–1048, which reads:

"A finding of paternity established in any other state shall have the same force and effect in a proceeding under this subtitle as in any other civil proceeding in this State if:

"(1) with respect to an adjudication of paternity, the finding was established by a court or by an administrative process that includes a right to appeal to a court; or

"(2) with respect to a finding of paternity that is based on an affidavit of parentage, the affidavit was signed after each signatory to the affidavit was advised of their legal rights."

■ We interpret "finding of paternity," as used in the introduction to § 5–1048 and in subsection (2) thereof, to refer to the effect of the voluntary acknowledgment under South Dakota law. It is clear that foreign judicial adjudications or administrative orders establishing paternity are treated in subsection (1). It is the alternative in subsection (2) that addresses the voluntary affidavit of paternity. We construe the term "finding," as used therein, consistently with the use of the same term in the Federal Act, under which "a signed voluntary acknowledgment of paternity is considered a legal finding of paternity[.]" 42 U.S.C. § 666(a)(5)(D)(ii).

Further, Professor William L. Reynolds of the University of Maryland School of Law, writing with Susan F. Paikin, has described this aspect of the Federal Act as follows:

"Although not a traditional judgment, voluntary paternity acknowledgments now create a conclusive determination of paternity, subject to a 60–day rescission period. The acknowledgment itself becomes a legal paternity determina-

tion, entitled to full faith and credit. Beyond the rescission period, the acknowledgment may be challenged only on proof of fraud, duress, or material mistake of fact."

S.F. Paikin and W.L. Reynolds, *Parentage and Child Support, Interstate Litigation and Same–Sex Parents*, 24 Del. Law. 26, 28 (Spring 2006) (footnote omitted).

Further, interpreting "its" in 42 U.S.C. § 666(a)(5)(C)(iv) to refer to South Dakota in this case is consistent with the longstanding meaning of full faith and credit set forth in 28 U.S.C. § 1738 ("Such ... records ... shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken.").

In any event, even if we were literally to apply the introduction of FL § 5–1048 ("same force and effect ... as in any other civil proceeding in this State"), it would not alter the result in this case. This we explain in Part C, *infra.*

### B. South Dakota Law

■ There is no decision of the Supreme Court of South Dakota that addresses attempted disestablishment of paternity by a non-biological father where the determination of paternity was based on a voluntary acknowledgment. Here, the challenge to the paternity determination was made more than three years after the presumption of paternity, based on voluntary acknowledgment, arose. Michael has not presented any constitutional issue concerning SDCL § 25–8–59, under which a rebuttable presumption of paternity is no longer challengeable, even on the grounds of fraud, duress, or material mistake of fact, more than three years after the presumption arose. For the reasons set forth below, we hold that the conclusive presumption under SDCL § 25–8–59 would be applied by the Supreme Court of South Dakota to this case.

Our review of the South Dakota decisions begins with *In re Support Obligation of Do Rego*, 2001 SD 1, 620 N.W.2d 770 (2001). The case involved the presumption of legitimacy recognized in SDCL § 25–8–57. That statute provides:

"Any child born in wedlock, or born within ten months after dissolution of the marriage, is presumed legitimate to that marriage even if the marriage is subsequently declared to be null and void, or subsequently dissolved by divorce. This rebuttable presumption of legitimacy can only be disputed by the husband or wife, or a descendant of one or both of them."

Do Rego had been romantically involved with the mother, Vickie, from 1985 to the fall of 1987. When she informed him that she was pregnant, their relationship ended, and, on December 26, 1987, Vickie married Michael. "At the time of the marriage, Michael was aware of Vickie's pregnancy as well as the fact that he was not the father." 620 N.W.2d at 770. The child was born April 10, 1988, was given Michael's last name, and was treated by him as his child. For reasons that do not appear in the opinion, in November 1999, Vickie sought support from Do Rego through the South Dakota Title IV–D child support agency. Do Rego requested and received a DNA test that revealed a 99.9% probability that he was the child's father. The trial court held that Do Rego was not legally responsible for support, and the Supreme Court of South Dakota affirmed.

The court reasoned as follows:

"Whether this evidence effectively rebuts the presumption of legitimacy will not be reached as the statute of limitation to contest the presumption has expired. Any action to challenge a presumption of legitimacy must be brought within sixty days of the creation of the presumption or within three years of that date in cases of fraud, duress or material mistake of fact. SDCL 25–8–59. The presumption in this case was created on the date of [the child's] birth, April 10, 1988. Because no fraud, duress or material mistake has been alleged, the presumption of legitimacy could only be contested within sixty days of that date. That period expired long before Vickie challenged the legitimacy presumption in 1999."

*Id.* at 771–72. The court also rejected Vickie's argument that § 25–8–59 applied only to a presumption of paternity, but not to the presumption of legitimacy under § 25–8–57. The court held that the former section applied to both. It concluded that "[b]ecause Vickie did not rebut the presumption of legitimacy within the allowed period of time, she is precluded from challenging it now." *Id.* at 772.

In *Department of Soc. Servs. ex rel. Wright v. Byer,* 2004 SD 41, 678 N.W.2d 586 (2004) (*Byer I* ), the court held the sixty-day statute of limitations in SDCL § 25–8–59 to be unconstitutional on equal protection grounds. That case likewise involved the presumption under SDCL § 25–8–57 that a child born in wedlock, or within ten months after dissolution of the marriage, is legitimate. The child was born within ten months after Byer and the mother divorced, but DNA evidence proved that Byer was not the biological father. The trial court applied *Do Rego.* In a 2–1–2 decision, the appellate court concluded that the statute unconstitutionally discriminated against children with presumed fathers, as contrasted with children without a presumed father.

The child support enforcement agency sought rehearing. In *Department of Soc. Servs. ex rel. Wright v. Byer,* 2005 SD 37, 694 N.W.2d 705 (2005) (*Byer II* ), the movant asserted

"that the decision in *Byer I* would result in a loss or reduction of substantial federal funds for child support enforcement because the portion of the statute declared unconstitutional was part of a federal mandate."

694 N.W.2d at 705.

In a 3–2 decision, the court in *Byer II* "suspend[ed] the question whether SDCL § 25–8–59 is unconstitutional." *Id.* at 707. The court said that it needed a more complete factual record before finally ruling on the matter.

The most recent relevant South Dakota decision that our research has disclosed is *Chapman v. Chapman,* 2006 SD 36, 713 N.W.2d 572 (2006). The background facts were set forth by the court.

"David and Michele were married on January 20, 1999. During the course of the marriage, Michele became pregnant. Michele moved from the marital home in 2000 when she was approximately six months pregnant. She gave birth to a daughter, S.M.A., on June 2, 2000. Michele did not list David as the father of S.M.A. on the birth certificate, electing to leave the name of the child's father blank. Instead, she listed the child's last name as that of her former spouse whom she divorced before her marriage to David."

713 N.W.2d at 575.

In the fall of 2001, Michele initiated child support proceedings that David did not contest. A support order and judgment were entered against him on December 12, 2001. David sued for divorce in March 2004. In that proceeding, he contested paternity and sought a paternity test. That motion was denied.

The Supreme Court of South Dakota applied SDCL § 25–8–59 in affirming. The court said:

"Even if the circuit court had found David's arguments regarding fraud, duress or material mistake of fact persuasive, all that David gained was three years instead of sixty days from the child's date of birth of June 2, 2000, in which to contest paternity. David's first paternity contest was filed on March 3, 2004, almost nine months after the expiration of the three year statute of limitation. Therefore, David failed to timely file his paternity contest per the three year statute of limitations in SDCL 25–8–59."

*Id.* at 578–79.

David also contended that SDCL § 25–8–59 was unconstitutional. The court would not consider that contention for the reasons set forth below:

"However, in his brief David contends that he has been injured by the sixty-day statute of limitations in SDCL 25–8–59, but offers no facts to support this position. The facts of the instant case are clear, in that David caused his own injury by failing to timely contest the child support obli-

gation. David offers no authority for his proposition that he was precluded from a full and fair opportunity to initiate a paternity contest due to the constraints of SDCL 25–8–59."

*Id.* at 580.

We are persuaded that South Dakota, under the circumstances presented here, including the absence of a constitutional challenge, would apply the rationale described above and would apply the SDCL § 25–8–59 presumption, based on voluntary acknowledgment.

The Illinois counterpart, see 42 U.S.C. § 666(a)(5)(D)(ii) and (iii), to the South Dakota voluntary acknowledgment provisions was before the court in *People ex. rel. Department of Pub. Aid v. Smith,* 212 Ill.2d 389, 289 Ill.Dec. 1, 818 N.E.2d 1204 (2004). In that case, Smith had executed a voluntary acknowledgment of paternity two days after the mother gave birth. Approximately four and one-half years later, Smith sought a declaration of non-paternity. A DNA test showed that there was no chance that he was the biological father of the child. The Supreme Court of Illinois, reversing the intermediate appellate court, held that Smith could not disestablish paternity.

That result was based in large part on the construction of two sections of the Illinois Paternity Act, 750 Ill. Consolidated Statutes 45/5(b) and 6(d) (West 2002), which in essence allowed sixty days to rescind the voluntary acknowledgment, unless fraud, duress or material mistake of fact was established. In explanation of its conclusion, the court stated:

"The Parentage Act provides that the marital presumptions of paternity are rebuttable presumptions, while the voluntary acknowledgment presumptions are conclusive presumptions. Section 5(b) provides that the marital presumptions may be rebutted only by clear and convincing evidence. 750 ILCS 45/5(b) (West 2002). By contrast, the presumption arising from a voluntary acknowledgment becomes conclusive if not rescinded before the earlier of two dates provided by the Parentage Act.... Thus, it makes sense to allow

presumed fathers under sections 5(a)(1) and (a)(2) to challenge the presumption with DNA evidence because that is merely a rebuttable presumption that can be overcome by clear and convincing evidence. It makes no sense, on the other hand, to allow those men who sign voluntary acknowledgments to challenge the presumption of their paternity with DNA evidence because the presumption with respect to them is conclusive. Under the limited circumstances presented in section 6(d), a man who voluntarily acknowledges paternity can later challenge the *voluntariness* of the acknowledgment if he can show that it was procured by fraud, duress, or material mistake of fact, but the Parentage Act does not allow him to challenge the conclusive presumption of paternity with contrary evidence.

"The Parentage Act's disparate treatment of these two groups of presumed fathers is logical. A man who voluntarily acknowledges paternity signs an acknowledgment form advising him of his rights and specifically informing him that he is accepting the responsibility of being a parent to the child, that he has a right to genetic testing, and that he is waiving that right by signing the voluntary acknowledgment. Thus, a presumed father who signs a voluntary acknowledgment is in an entirely different position from a man who simply assumes he is the child's father because of his marriage to the child's mother. Unlike a man presumed to be a child's father under subsection (a)(1) or (a)(2), a man who signs a voluntary acknowledgment of paternity specifically agrees to forgo any further inquiry into whether he is the child's biological father and to assume the responsibility for being a parent to the child. Clearly, it would be unreasonable to allow a man in this position to undo his voluntary acknowledgment years later on the basis of DNA test results, when his paternity was based not on a mere marital presumption that he was the child's father but on his conscious decision to accept the legal responsibility of being the child's father. This is obviously the reason that the legislature chose to make the marital presumptions

rebuttable and the voluntary acknowledgment presumptions conclusive."

289 Ill.Dec. 1, 818 N.E.2d at 1213–14.

South Dakota, as we have seen above, treats the presumption of legitimacy as unrebuttable after three years. Based on the rationale of the Illinois Supreme Court in *Smith*, we conclude that the Supreme Court of South Dakota would not decline to apply that state's conclusive presumption statute to a voluntary acknowledgment of paternity, in a case raising no constitutional issues.

### C.  Maryland Law

■  Alternatively, we now consider whether FL § 5–1048 directs us to Maryland law, and, if so, what the result would be.  The introduction to that section states that "[a] finding of paternity established in any other state shall have the same force and effect in a proceeding *under this subtitle* as in any other civil proceeding in this State[.]"  (Emphasis added). Under a literal reading, FL § 5–1048 does not apply here. The divorce action between Christine and Michael was not a paternity proceeding under Subtitle 10, "Paternity proceedings."

If FL § 5–1048 does apply, then the force and effect of the finding of paternity based upon voluntary acknowledgment is set forth in FL § 5–1028(d), which in relevant part reads:

"(1) An executed affidavit of parentage constitutes a legal finding of paternity, subject to the right of any signatory to rescind the affidavit:

"(i) in writing within 60 days after execution of the affidavit; or

"(ii) in a judicial proceeding relating to the child:

"1.  in which the signatory is a party;  and

"2.  that occurs before the expiration of the 60–day period.

"(2)(i) After the expiration of the 60–day period, an executed affidavit of parentage may be challenged in court only on the basis of fraud, duress, or material mistake of fact.

"(ii) The burden of proof shall be on the challenger to show fraud, duress, or material mistake of fact."

FL § 5–1028(d)(2) does not fix any time limit within which the finding of paternity may be challenged on the ground of fraud, duress, or material mistake of fact. In the case before us, clearly there was no fraud or material mistake of fact. Michael knew, beyond doubt, that he was not Malachi's father when he signed the paternity affidavit. Nor did he do so under duress, inasmuch as he admitted that he signed the affidavit in order to give Malachi the surname, Burden.

### Conclusion

For all the foregoing reasons, the judgment of the Circuit Court for Baltimore County is reversed with respect to the denial of child support to be paid by Michael for Malachi. The case is remanded in order for that court to consider the appropriate support order.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY THE APPELLEE.**